[Crim. No. 10592. Second Dist., Div. Three. Feb. 4, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. STANLEY OLIVER GOREE, Defendant and Appellant.

---

Douglas L. Glaser, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, J.—By information defendant was charged with possession of marijuana on June 24, 1964. A jury found him guilty as charged, probation was denied and he was sentenced to state prison. This appeal followed.

Defendant attacks the sufficiency of the evidence and claims prejudicial error in the refusal of the trial court to give certain instructions requested by him.

The facts of the case are unusual. On June 24, 1964, defendant was due to appear in another matter in department 110 of the Los Angeles County Superior Court.[1] He entered the ,courtroom at 11:40 a.m. sat down, removed his shoes and appeared to go to sleep. Deputy Sheriff Nygaard, the bailiff in the courtroom, had a bench warrant for defendant's arrest in his possession. He approached defendant, asked him for his name, and having ascertained that he was the person named in the bench warrant, placed him under arrest and put him into the holding tank adjoining the courtroom which was empty at the time. He did not search him. Defendant was carrying a small plastic overnight bag which was left in the courtroom.

Defendant's gait was staggering, he was incoherent in his speech and did not have any alcohol on his breath. Deputy Nygaard who was an experienced officer came to the conclusion that defendant was under the influence of narcotics and notified the narcotics detail.

At about 12:25 p.m. Deputy Farrington of the narcotics detail arrived and entered the holding tank with Nygaard. Defendant was lying on a bench, retching and groaning. Nygaard and Farrington stepped outside the tank. The deputy public defender who was supposed to have represented

---

[1] At the trial it was stipulated that defendant was appearing as defendant on another charge. His present attorney also represented him in the superior court. We assume that the several statements in defendant's brief to the effect that defendant's court appearance was "for the purpose of testifying as a *party witness* in another action" are not intentionally ambiguous.

defendant that morning was still in the courtroom, so Nygaard and Farrington decided to bring defendant into the courtroom and to interrogate him in the presence of his attorney. Nygaard reentered the tank. He then observed a "bundled up"[2] piece of newspaper lying next to the toilet. He opened it. It contained a green leafy substance resembling marijuana, a marijuana cigarette burned down to a stub, known as a "roach," two quarters and one dime.[3]

Farrington and Nygaard then talked to defendant in the presence of the deputy public defender. He was told that he need not answer any questions and that he had the right to counsel. Although defendant had some difficulty staying awake, he stated that he understood the officers' caution. During the conversation he denied knowing anything about the package found in the tank, denied that he had been drinking, had taken any medicine, was sick or under the care of a doctor. Detective Farrington was of the opinion that defendant was under the influence of "some type of hypnotic and also recently used some amount of marijuana."

When Farrington first saw defendant he was wearing a pair of slacks and a light cotton shirt. Although the shirt was within his pants it was "bloused out." The officer demonstrated how defendant wore his shirt, the purpose of the demonstration being to show that defendant could have hidden the newspaper containing the marijuana under it.

The People's theory of the case against defendant was that he had the marijuana on his person when he entered the courtroom, took it into the holding tank with him and then somehow put or dropped the newspaper in which it was wrapped onto the floor. To substantiate this theory the People set out to prove that, when defendant was placed in

[2]This is the term used by Nygaard when he first described the newspaper. At a later stage, during cross-examination, when counsel for defendant was attempting to impress the jury with the volume of the newspaper, he showed it to Nygaard in a condition not described in the record and Nygaard said: "I'd say it was a little more neatly wrapped." We have examined the exhibit. It consists of two double pages of the Los Angeles Times of Wednesday, June 24, 1964, and arrived in this court rather neatly folded. It is about 6 inches long, 4 inches wide and can easily be compressed into a thickness of less than one-half inch. It does not appear to have been folded in any other fashion nor does it appear to have been crumpled up at any time.

[3]It was stipulated that the "green material, the leafy substance, the stems and seeds" were marijuana. While this leaves some uncertainty whether the contents of the "roach" were meant to be covered by the stipulation, it is quite apparent from the context that it was meant to refer to all of the substances found.

the empty holding tank, it contained no marijuana and that no one entered it or had an opportunity to put any marijuana into it between the time that Nygaard left defendant alone and the time when he discovered the newspaper on the floor. Evidence was produced that at 10 a.m. Nygaard removed three prisoners from the tank and then searched it without finding anything of an unusual nature in it. In particular there was no paper bundle on the floor.

The holding tank is entered through a door made of iron or steel bars. A heavy wire mesh covers the bars but only up to a height of 8 feet and it is therefore physically possible to throw objects of considerable size into the tank. Immediately outside the tank is a small hallway, entrance to which can be gained through three doors. Directly across from the holding tank is a door leading into the courtroom ("courtroom entrance") which was not kept locked but was always within Nygaard's view and earshot and no one went through it.[4] To the right of the courtroom entrance is a door leading to the judge's chambers ("chambers entrance") which is always kept locked. Nygaard observed no one beside the judge, except possibly the clerk, enter the judge's chambers from the courtroom. To the left there is a door leading from the small hallway directly into the main corridor ("corridor entrance") outside the courtroom. This door is also locked and was not, of course, visible to Nygaard from the courtroom. The record is somewhat cloudy as to whether or not Nygaard would have heard anyone enter the hallway outside the tank through the corridor entrance. He testified that it does not make noise and that he did not believe one would be able to hear it from the courtroom. On the other hand the record reflects the following: Q. (by defense counsel): "You have testified that there are two doorways that make noise, but that there is one door, rather, not doorway, that doesn't make noise, and that's the door from the hall; am I not correct? A. I say it doesn't make noise, but in order to lock it, you have to slam it, so—"

The record contains suggestions by defense counsel that either Nygaard was not constantly watching the courtroom

---

[4]The possibility of someone entering the holding tank area through the courtroom while defendant was in the tank from 11:40 to 12:25 was only inferentially eliminated. Apparently neither the prosecution nor the defense gave it serious thought. Nygaard testified that the door to which we refer as the "courtroom entrance" was noisy and that he did not hear it between 11:40 and 12:25. Throughout the period he was seated at the bailiff's desk in the courtroom. He stated positively that he saw no one enter between 10 a.m. and 11:40 a.m.

entrance, or did not hear someone enter through the corridor entrance and that somehow, somebody gained entrance into the hallway and threw the newspaper bundle into the tank through the bars above the wire mesh either before defendant was put into the tank or while defendant was asleep. These of course are possibilities, but it was for the jury to determine whether they created a reasonable doubt.

The "locked room gambit" is a favorite of detective story writers, but even without expertise in the field we might add to the possibilities suggested that comparatively little attention was paid to the chambers entrance, except for a statement that it was locked. The clerk, or for that matter the judge who presumably left the bench at noon, or anyone in the judge's chambers from before 10 a.m. and in possession of the key to the chambers entrance, which was not accounted for, could have entered the hallway in that fashion and disposed of the narcotic.

Admittedly the case against defendant rested entirely or almost entirely on circumstantial evidence. The jury was instructed as set forth in the footnote.[5] It is apparent that the jury rejected all of these possibilities, found that no circumstances were proved which were irreconcilable with any rational conclusion except the one that defendant was guilty and that each fact essential to the chain of circumstances

[5] "If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.

"You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt."

"I instruct you further that you are not permitted on circumstantial evidence alone, or when the case of the People rests substantially on circumstantial evidence, to find the defendant guilty of [the] crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion."

"When the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt."

establishing defendant's guilt was proved beyond a reasonable doubt.

■ On appeal defendant argues that there is no evidence from which an inference could be drawn that defendant was at any time in physical possession of the newspaper bundle or the marijuana contained in it. This argument is based on testimony by Nygaard that when he first saw the newspaper on the floor he was unable to tell what was inside of it and that it was never tested for fingerprints. Since there is abundant evidence that the newspaper, as found by Nygaard, with the narcotic wrapped in it, was brought to the tank by defendant, we do not see the logic of that argument.

Much is made of the fact that there is no direct evidence that the newspaper and its contents were on defendant's person, clothing or other belongings. As noted this evidence was supplied by exclusion of all other reasonable possibilities which might have accounted for the marijuana being in the tank at 12:25 p.m.

■ Since Nygaard's testimony is vital to the People's case, defendant attempts to show that he had to be discredited. At one point Nygaard was asked whether he searched the tank after 10 o'clock and before 12:25 when Farrington arrived and denied having done so. Later on he testified that when he placed defendant into the cell at 11:40 he did not notice anything on the floor by the toilet, a negative visual impression which the deputy district attorney chose to characterize as a ''fast visual search.'' Whether or not any scintilla of contradiction which is inherent in this testimony should discredit Nygaard was for the jury.

Other arguments concerning Nygaard's credibility are so patently without merit in an appellate court, that they need not be further considered.[6]

■ It is also urged that there is no evidence that defendant knew the narcotic nature of the substance found. The Attorney General, in reply, relies chiefly on the testimony of the two deputies concerning defendant's condition and their inferences drawn from it. We are not too sure that the evidence really justifies the position taken. Nygaard only said that in his opinion defendant was under the influence of a narcotic. Farrington testified that he was ''under the influ-

---

[6]For example, it is argued that the bailiff's testimony that nobody could get into the hallway outside of the tank was not even believed by the bailiff himself, or else why should he have conducted a ''search'' of the tank at 11:40 a.m. when he placed defendant into the tank, having just completed a search at 10 a.m.

ence of some type of hypnotic and also recently used some amount of marijuana.'' On cross-examination he said that marijuana was an excitant. This left the impression that the sleepy, lethargic condition of defendant must have been due to the hypnotic, rather than any marijuana. On redirect the deputy district attorney committed the sin of asking one question too many in classic fashion.[7] All this left the bare conclusion of Officer Farrington that defendant had ''recently used some amount of marijuana.'' Nobody dared ask him on what this conclusion was based.[8]

Whatever may be the probative value of this testimony on defendant's knowledge of the narcotic character of the substance, we believe that the physical evidence amply supports a conclusion that defendant knew the nature of the contents of the newspaper.

The newspaper itself is of questionable value. The pages are advertisements for the annual Sears-Roebuck ''Summer Specials.'' Defendant appeared in court apparently prepared for a confinement of some duration and presumably did not intend to do any shopping. Thus there appears to be no rational explanation for his possession of the newspaper pages except in their capacity as a container of something of value. Coins are not usually carried wrapped in newspaper. The only item of value remaining is the roach. While a layman might possibly mistake the roach for a cigarette butt, few, if any, would attach such value to a cigarette butt that they would carefully wrap it in newspaper.

Further, once it is accepted that the defendant brought the newspaper and its contents to the courtroom, his denial to the two officers of having done so takes on a meaning indicating a consciousness of guilt, which, as the Supreme Court has indicated, is sufficient to support a finding of the required

---

[7] ''Q. What happens after the period of excitement passes after taking marijuana? A. Oh, the person may become lethargic, depressed. Q. Sleepy? A. Yes, sir. Q. Just like the defendant was? A. *No. The defendant was, as I stated, under the influence of some other type hypnotic.*''

[8] The deputy district attorney may have been afraid that it was based only on the fact that the officer had recognized the contents of the newspaper bundle as being marijuana, in which case his opinion that the defendant had smoked the used portion of the cigarette would have been no stronger than that of any layman and therefore subject to motion to strike. Defense counsel was probably understandably afraid that the officer would give an answer which would destroy the effect of the redirect examination.

knowledge. (*People* v. *Redrick,* 55 Cal.2d 282, 287-288 [10 Cal.Rptr. 823, 359 P.2d 255].)

We therefore find that the possession of the narcotics under the circumstances of this case support a reasonable inference that defendant was aware of his possession of marijuana and of the narcotic character thereof. (*People* v. *Millum,* 42 Cal.2d 524 [267 P.2d 1039]; *People* v. *Hamilton,* 223 Cal.App.2d 542, 545 [35 Cal.Rptr. 812].)

The balance of defendant's brief is devoted to the refusal of the trial court to give certain instructions on the subject of ''constructive possession.'' Initially it might be observed that this is really not a case of constructive possession. If the only evidence produced would be evidence of what Nygaard and Farrington found in the tank at 12:25 p.m. without any further evidence negativing access of other persons to the tank after the time when defendant was put in it, the conviction would be very difficult to sustain on appeal. The proof adduced by the People did not so much show that when defendant was lying on the bench of the holding tank, retching and groaning, he was then in constructive possession of the marijuana which was lying on the floor several feet away, but that he had it in his actual physical possession when he entered the courtroom and then the tank. Defendant's reference to the rule, unquestionable and unquestioned, that he is entitled to proper instructions on his theory of the case is therefore out of place. The requested instructions do not refer to defendant's theory, but to a theory which he seeks to fasten on the prosecution to the exclusion of any other.

However, since the court at the request of the People instructed on constructive possession, we will discuss the requested instructions in the light of the applicable law and the instructions given, which are set forth in the footnote.[9]

---

[9]''Every person who possesses any narcotic such as marijuana is guilty of a crime. To constitute the illegal possession denounced by the law, the accused must exercise dominion and control over the narcotic with knowledge (1) of its presence and (2) of its narcotic character.''

''Within the meaning of the law, a person is in possession of a narcotic when he knowingly has the narcotic under his dominion and control, and, to his knowledge, it either is carried on his person or is in his presence and custody, or, if not on his person or in his presence, the possession thereof is immediate, accessible, and exclusive to him.''

''To constitute the illegal possession of a narcotic, the acts of dominion and control must be accompanied by knowledge on the part of the accused of (1) the presence of the narcotic object, and (2) of its narcotic nature. Unless such knowledge exists, the crime of illegal possession of a narcotic is not committed.

■ The first instruction, requested by defendant and refused, reads as follows: "Possession of personal property may be either physical or constructive. Physical possession is established when it is shown that a person had physical control of an article with the intent to exercise such control, and would be illustrated by possessing marijuana in the hand, clothing, bag or other container or body openings. There is no evidence of physical possession of this kind in this case.

"Therefore, if there be any illegal possession under the law, it must be the other kind of possession mentioned earlier, constructive possession. For constructive possession to be present, you must find that the defendant had immediate and exclusive dominion and control over the article. This means that while the marijuana need not be on the person of defendant, it must be immediately accessible to him in some place under his control; and it is for you, the jury, to decide whether or not, under the circumstances of this case as shown by the evidence, a holding tank cell or jail cell in the Los Angeles County Hall of Justice Courthouse is a place subject to the dominion and control of the defendant." We see no error in the refusal to give the instruction. First of all, the statement that "there is no evidence of physical possession of this kind in this case" is wrong in view of the above discussion. The last sentence, leaving it to the jury to decide whether or not the holding tank is a place subject to the dominion and control of the defendant is based on his counsel's theory, argued at length below, that it is a necessary part of the offense that the alleged offender have dominion and control over the place in which the narcotics are found, as distinguished from the narcotics themselves.[10] Defendant's counsel overlooks one vital distinction between the present case and those cited by him: whatever may be said about dominion and control over a place where the narcotics

---

"The knowledge required by law may be shown by circumstantial evidence; it is manifested by the circumstances attending the possession, the manner in which it is exercised, the means used, and the sound mind and discretion of the person committing the act."

[10] The trial judge disposed of this argument by a very neat analogy: "THE COURT: . . . Where is your briefcase? MR. GLASER: It is right there, your Honor. THE COURT: It is in my chambers, isn't it? MR. GLASER: Yes. THE COURT: Do I have dominion and control over your briefcase? MR. GLASER: It is a difficult question to answer. THE COURT: No—— well, that goes to the heart of the matter. MR. GLASER: A question of fact. THE COURT: Do I have dominion and control—or putting the question the other way, do you have dominion and control over my chambers? MR. GLASER: No, I don't. THE COURT: You still possess that briefcase. That's your answer."

are found such as a padlocked storeroom in a rooming house separated from defendant's room by a hall (*People* v. *Redrick,* 55 Cal.2d 282, 284 [10 Cal.Rptr. 823, 359 P.2d 255]) or a suitcase in a garage (*People* v. *Martinez,* 117 Cal.App.2d 701, 703 [256 P.2d 1028]) or a closet near defendant's apartment (*People* v. *Barnett,* 118 Cal.App.2d 336, 338 [257 P.2d 1041]), in all of which cases the defendant is outside of the room, enclosure or container mentioned, can have no application to a case, such as this one, where defendant and the narcotics are both within.

It is difficult to see what other thought, favorable to defendant, is contained in the refused instruction which is not covered by those given. A careful comparison merely reveals the following: defendant's definition of "physical" as distinguished from "constructive" possession makes it clear that the narcotic, which was in this case some several feet away from defendant, was not within his physical possession. Therefore, under defendant's instruction, the jury had to find that he had "immediate and exclusive dominion and control" over the narcotic. The court's instruction prescribed a substantially similar requirement only if the narcotic was not on defendant's "person or in his presence." The words "in his presence" are not defined. It is conceivable, even probable, that the jury found the narcotic to have been in defendant's presence, but even so they were required, under the court's instruction, to find that he had it "under his dominion and control," which appears to us quite adequate under the circumstances.

The second instruction requested by defendant and refused, reads as follows:

"If you should find that the defendant, in fact, had constructive possession of the narcotics, it is still necessary that you find that the defendant had knowledge of its presence and its narcotic character, as I instructed you earlier, and the prosecution has not satisfied its burden to show such knowledge of possession if it has done no more than show the presence of narcotics in the place in which the defendant is found or to which he has access."

The first part of this instruction is amply covered by CALJIC 703-A quoted in the footnote.[11]

---

[11]"To constitute the illegal possession of a narcotic, the acts of dominion and control must be accompanied by knowledge on the part of the accused of (1) the presence of the narcotic object, and (2) of its

The second part is purely negative. It adds nothing to the positive requirement placed on the prosecution by the instruction that was given.

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

narcotic nature. Unless such knowledge exists, the crime of illegal possession of a narcotic is not committed.

"The knowledge required by law may be shown by circumstantial evidence; it is manifested by the circumstances attending the possession, the manner in which it is exercised, the means used, and the sound mind and discretion of the person committing the act."