[Crim. No. 13166.   Second Dist., Div. Four.   Nov. 27, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. DEWEY WILSON, Defendant and Appellant.

412

George R. Maury and Rob R. Schuyler for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant and his niece, Charlene Peterson, were charged with unlawfully possessing heroin for sale. (Health & Saf. Code, § 11500.5.) In count II, only Charlene Peterson was charged with another violation of the same section. Defendant and the codefendant were convicted but the judgments were reversed on appeal.[1] The matter was set for retrial. Pursuant to Penal Code sections 1539 and 1540, each moved to quash the search warrant which had been issued for a search of Charlene and her residence. After a hearing the motions were denied. Trial was by jury and defendant was found guilty as charged. Defendant's motion for new trial was denied, probation was denied, and defendant was sentenced to prison for the term prescribed by law. He has appealed; we affirm the judgment.

On June 8, 1963, at about 4:30 p.m., Officer James Grennan, of the Los Angeles City Police Department, accompanied by four other officers, went to the residence of Charlene Peterson. The officers had a search warrant to search her residence, her person, and her 1962 Ford automobile. The Ford was in the driveway and its path was blocked by a 1960 Chevrolet belonging to defendant. The officer placed the residence under surveillance.

About 6 p.m., Charlene left, driving the Chevrolet. Officer Grennan followed her. She looked over her shoulder, dropped her right hand from the steering wheel to the floor, then put both hands on the wheel. The officer arrested Charlene,

---

[1] The judgment was reversed for failure to allow defendants to traverse the affidavit on which the warrant was issued. (*People* v. *Peterson* (1965) 233 Cal.App.2d 481 [43 Cal.Rptr. 457].) As we point out, at the second trial the court conducted a full hearing on that issue; we review its determination in this opinion.

searched the car, and found two condoms of heroin under the front seat. The officer testified that Charlene's conduct in the automobile was furtive and suspicious. The officer also testified that, sometime between 4:30 and 6 p.m., prior to these events, he had conversed with ''a person'' who said he had ordered two ounces of heroin from Charlene ''to be delivered in the hour.''

The search warrant had been issued on May 31, 1963, on the basis of an affidavit of Officer Grennan. That affidavit[2] alleged that there was, then (*i.e.*, on May 31st) in the possession of Charlene, on her person, at her residence and in her Ford automobile, a quantity of heroin. As a basis for the officer's belief, the affidavit alleged information from several sources, some claimed to be tested and some not tested, that Charlene was engaged in the sale of heroin, delivered by automobile from a supply kept at her residence and that Charlene received her supply by ship from the Orient every three or four months and had just recently received such a shipment. In other testimony Officer Grennan stated that he had other information that the heroin allegedly on hand on May 31st was not yet ready for sale or distribution.

After Charlene's arrest, Officers Grennan and Hanks, and other officers, went to Charlene's residence. They knocked and, according to Officer Grennan, Mr. Wilson opened the door. Officer Hanks testified that they entered through an unlocked front door; Mr. Wilson was sitting in the living room, and the officer identified himself and exhibited a search warrant.

A search was undertaken and, in a broom closet, they found a Sears Roebuck bag containing 42 condoms of heroin. On a shelf in the closet Hanks found measuring spoons, empty balloons, condoms, and a portion of newspaper with a plastic bag and a condom containing powder. Officer Hanks, who had worked for the narcotics division for four or five years, formed the opinion that the heroin was packaged for sale. In Hanks' opinion, if the heroin recovered in the residence of Charlene Peterson was diluted to street percentage, the value would be around $1,000,000.

Dunzel Curtis, an expert forensic chemist, testified that the heroin did not come from Mexico, but that it came from Europe or the Orient, and that it could have come from certain countries which defendant visited.

---

[2]The full affidavit is set forth in the appendix to this opinion.

Defendant, as chief steward, sailed to the Far East several times a year. Defendant made five draws in salary at Okinawa, Formosa, Bangkok, and somewhere between Kobe and Yokohama. Defendant's earnings were $2,061.65, and at the end of the trip he had a total of $784.30 due him in salary. Defendant testified that, during his trip to the Orient, he purchased a tape recorder for $300, an art object for $25, and that he sent $200 home.

Defendant's boat docked in Oakland May 31, 1963. Members of the families of the crew would be given advance information as to the ship's arrival. Defendant went to Los Angeles on June 7, 1963. At about 11 p.m. he went to visit his niece. The next day, about 6 p.m., Charlene asked him to move his car out of her way, and defendant told her to use his car instead, since he was watching television.

Defendant denied ever smuggling narcotics. Defendant testified that three of Charlene's brothers were also seamen and that two of them worked for a line that went, among other places, to the Orient. Defendant did not have a copy of the cashier's check for the $200 he sent home from Okinawa. At defendant's former trial he was asked how much he drew "in any one port," and he said "it averaged $50 to maybe $200 in various ports." Defendant did not recall drawing the $300 until he heard it repeated when a witness testified. Defendant claimed he paid $300 in Yokohama for the tape recorder. At defendant's prior trial he testified that his room had been searched and at this trial he said no one searched the room. Defendant had listed the tape recorder to customs at $90, but defendant explained that the actual cost was $300. He explained that he changed his testimony at his previous trial in regard to whether there was a search because he discovered that the search which he testified to earlier was not a contraband search. At the time of his first trial he did not know what a contraband search was. Defendant said that when he testified that no search had been made of his room in the case at bar he meant no *contraband* search, and not another type of search.

Defendant advances numerous errors on appeal. Defendant alleged that the motion to quash the search warrant under Penal Code sections 1539 and 1540 was improperly conducted; that the evidence is insufficient to support the verdict; that the prosecution failed to state a public offense in his opening statement; that the officer forced his way into the house and exhibited no warrant; that the court erred in its instructions;

that there was misconduct of the prosecutor in his closing argument; and that there were numerous errors in evidence.

## I

Defendant asserts that the 1539 - 1540 hearing was improper in that the magistrate held that the burden is on the defendant to go forward in contesting the warrant and that each side produce witnesses they wanted; defendant argues that the burden should have been put on the prosecutor. Defendant also asserts that the prosecutor had the duty of producing the informants as witnesses, and that the officer is not a "witness" under sections 1539 and 869.

It has been held that the burden of establishing the invalidity of a search warrant is upon the defendant. (*Williams* v. *Justice Court* (1964) 230 Cal.App.2d 87, 97-98 [40 Cal.Rptr. 724].)

We have set forth, in the appendix, the affidavit in question. Tested by the rules laid down by the United States Supreme Court, as those rules have been interpreted by the California courts,[3] the affidavit was sufficient. On appeal, the test is whether or not the magistrate could form a reasonable belief, based on the information contained in the affidavit, that the articles sought were present at the place or places to be searched. It is immaterial that the affiant (usually a police officer) does not have personal knowledge of the data included in the affidavit, so long as the affidavit discloses (a) that the officer's informant had personal knowledge of the facts related by him to the officer, and (b) that the officer's informant was a person on whose statements the magistrate was entitled to rely. Tested by those rules, the affidavit here was sufficient. We cannot say that the magistrate was in error in regarding the information given to him about the informants as enough to establish their credibility. Although some of the informants' statements concerning Charlene do appear to have been hearsay as to them, there was some information, given as the personal knowledge of at least two informants, to corroborate any hearsay from the other informant.

Since we hold that the warrant was valid, it follows that the search of the Chevrolet was lawful and the narcotics thus found admissible, quite apart from any question of the right of the officer to arrest Charlene because of her "fur-

---

[3]Consult, *inter alia*: *People* v. *Pineda* (1967) 253 Cal.App.2d 443 [62 Cal.Rptr. 144]; *People* v. *Aguilar* (1966) 240 Cal.App.2d 502 [49 Cal.Rptr. 584].

tive'' conduct. The warrant authorized a search of Charlene's person. As we pointed out in *People* v. *Aguilar, supra,* 240 Cal.App.2d 502, 505, ''Since it is an obvious impossibility to search the person of an individual without first taking him into custody, the warrant impliedly authorized an arrest as a step in the authorized search.'' With Charlene lawfully in custody, and with knowledge of conduct on her part which suggested a recent secretion of something in the car she was driving, a search of the car as part of the procedure was clearly proper.

In addition, the information previously given to the officers, together with Charlene's conduct when she realized that she was being followed, was itself sufficient to justify her arrest and the search that followed.

## II

Defendant claims error on the theory that the officers forced their way into the apartment without exhibiting the warrant. Although, as above indicated, the two officers did not give exactly the same account of their entry, the jury could conclude that they entered with defendant's consent and that they did exhibit the warrant to him before the search began. The fact that Charlene had already been taken into custody destroyed neither the officers' rights under the warrant nor their right of entry, since they could well suspect that anyone in the apartment was likely to be involved in Charlene's operations.

## III

Defendant contends that he was erroneously refused the opportunity to cross-examine Officer Grennan concerning statements in his affidavit. The purported purpose was to show that the affidavit alleged that Charlene had already received a shipment of heroin on or before May 31st, at a time when defendant Wilson was still aboard his ship. These facts were obvious from the face of the affidavit itself and were developed during the trial; defendant suffered no prejudice from the ruling now complained of.

## IV

Defendant objects that the opening statement of the district attorney failed to state a public offense. We know of no rule requiring the district attorney to state a public offense in his opening statement, nor is there any reason to have such a rule since defendant is fully apprised of the charge against him in other ways. In *People* v. *Mihaly* (1928) 95 Cal.App.

563, 565 [272 P. 1103], defendant argued that the district attorney failed to state sufficient facts in his opening statement to show the commission of a crime. The court said the opening statements of counsel do not put a limitation on the right of either party to introduce evidence. In *People* v. *Stoll* (1904) 143 Cal. 689, 690 [77 P. 818], the court held that the opening statement of the district attorney is not evidence for any purpose nor conclusive as to the presentation of evidence not stated, and an instruction to the jury to find a verdict for defendant on such opening statement is void. Indeed, a prosecutor is not even required to make an opening statement. (*People* v. *Lopez* (1949) 93 Cal.App.2d 664, 667 [209 P.2d 439].) We believe that the logical conclusion based on the reasoning of these cases is that the prosecutor need not state a public offense in his opening statement.

## V

■ Defendant's assertion that the evidence is insufficient to support the verdict is not well taken.

■ The elements of the crime at bench require that the defendant exercise dominion and control over the narcotic, have knowledge of the narcotic's presence, and knowledge that the material was a narcotic. (*People* v. *Groom* (1964) 60 Cal.2d 694, 696 [36 Cal.Rptr. 327, 388 P.2d 359].) Constructive possession is all that is necessary, and this may be proved by circumstantial evidence. (*People* v. *Luke* (1965) 233 Cal. App.2d 793, 796 [43 Cal.Rptr. 878]; *People* v. *Flores* (1957) 155 Cal.App.2d 347 [318 P.2d 65].) ■ To show knowing possession of narcotics, the conduct of the parties, admission and contradictory statements and explanation are frequently enough. (*People* v. *Hokuf* (1966) 245 Cal.App.2d 394 [53 Cal.Rptr. 828]; *People* v. *Ortiz* (1960) 185 Cal.App.2d 622, 624 [8 Cal.Rptr. 494]; *People* v. *Torres* (1950) 98 Cal.App.2d 189 [219 P.2d 480]; *People* v. *Foster* (1953) 115 Cal.App.2d 866 [253 P.2d 50].)

■ Here defendant Wilson was in apparent possession of the apartment where the major part of the heroin was found, his automobile was being used to make a delivery of heroin, and he told contradictory and somewhat ingenuous stories to account for large expenditures of funds while in places where the heroin could well have been purchased. It is true that the affidavit on which the search warrant issued had claimed that Charlene possessed some heroin before Wilson's arrival, and that he had an explanation for all of the incrimi-

nating facts. But the jury was not required to believe him, and it was its function, and not ours, to weigh the conflicting evidence and the inferences to be drawn therefrom. We cannot say that its verdict was without support.

Since the jury was entitled to believe that Wilson had furnished his automobile for the purpose of delivery of heroin, the evidence of Charlene's arrest and the search that followed was properly admitted against him. It is immaterial whether or not the evidence would support a finding of conspiracy between Wilson and Charlene (although we think that it would).[4] Even if Wilson is regarded only as guilty of aiding and abetting Charlene's possession for sale, it is a part of the People's case to prove the guilt of the common law principal. The evidence complained of did no more.

## VI

Defendant alleges error in instructions to the jury. The instruction requested by the defendant and refused by the court was:

"The elements which the People must prove to establish the crime of possession of narcotics for sale are:

"1. Dewey Wilson must be shown to have had possession of the contraband, which means he must be shown to have exercised dominion and control over the contraband, and

"2. Dewey Wilson must be shown to have had knowledge both of the presence of the drug and of its narcotic character, and

"3. That Dewey Wilson had such dominion, control and knowledge for the purpose of selling the contraband."

The instructions given by the court were as follows:

"Every person who possesses any narcotic such as heroin for purpose of sale is guilty of a crime.

"To constitute the illegal possession of a narcotic, the acts of dominion and control must be accompanied by knowledge on the part of the accused of (1) the presence of the narcotic object, and (2) of its narcotic nature. Unless such knowledge exists, the crime of illegal possession of a narcotic is not committed.

"The knowledge required by law may be shown by circum-

---

[4]For a discussion of the difference between conspiracy (requiring evidence of a prior agreement) and aiding and abetting, consult *People* v. *Samarjian* (1966) 240 Cal.App.2d 13 [49 Cal.Rptr. 180]. As we there pointed out, the nature of the trade in narcotics is such that the existence of a conspiracy to sell is more easily inferred than where the parties deal in goods not necessarily "contraband."

stantial evidence; it is manifested by the circumstances attending the possession, the manner in which it is exercised, the means used, and the sound mind and discretion of the person committing the act.

"Within the meaning of the law, a person is in possession of a narcotic when he knowingly has the narcotic under his dominion and control, and, to his knowledge, it either is carried on his person or is in his presence and custody, or, if not on his person or in his presence, the possession thereof is immediate, accessible, and exclusive to him [, provided, however, that two or more persons may have joint possession of a narcotic if jointly and knowingly they have the dominion, control and exclusive possession I have described]."

Defendant argues that the wording of the case of *People* v. *Redrick* (1961) 55 Cal.2d 282 [10 Cal.Rptr. 823, 359 P.2d 255], should have been used to formulate the instruction. "The admonition has been frequently stated that it is dangerous to frame an instruction upon isolated extracts from the opinions of the court." (*Francis* v. *City & County of San Francisco* (1955) 44 Cal.2d 335, 341 [282 P.2d 496].)

It is unnecessary to give an instruction where the instruction is amply covered by another instruction (see *People* v. *Goree* (1966) 239 Cal.App.2d 906, 916-917 [49 Cal.Rptr. 166]), and undue repetition in instructions is improper (see *People* v. *Bickerstaff* (1920) 46 Cal.App. 764 [190 P. 656]). In the case at bench, the instruction given fully covered the instruction requested by defendant nor can we find anything wrong with the sequence of instructions. The jury could not have been misled by being told that "every person who possesses any narcotic such as heroin for purpose of sale is guilty of a crime," where the jury was also fully instructed on the requirements of knowledge, dominion and control.

Defendant argues that there was no evidence on which to instruct on "joint possession" and therefore the instruction on joint possession was improper. In view of what we have said earlier it follows that this instruction was not error.

## VII

Defendant also alleges prejudicial misconduct in the argument to the jury. It is true that the prosecutor went outside of the record by stating the value of heroin in the Orient, and he also improperly stated his personal belief as to the guilt of the defendant. However, when the defendant objected to both these errors the court sustained the objection

and instructed the jury to disregard the remarks of counsel. An instruction to the jury of this type cures the error. (See *People* v. *Harrington* (1957) 154 Cal.App.2d 857, 860 [317 P.2d 161]; *People* v. *Brice* (1957) 49 Cal.2d 434, 437 [317 P.2d 961].) At several other times defense counsel objected to other statements of the prosecutor but the objections were of the most general nature. Furthermore, defendant did not make an assignment of misconduct and seek a curative instruction as he is required to do. (*People* v. *Hampton* (1956) 47 Cal.2d 239 [302 P.2d 300].) We do not believe the defendant was prejudiced by the remarks of the prosecutor.

The judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

### APPENDIX

"IN THE MUNICIPAL COURT OF LOS ANGELES JUDICIAL DISTRICT
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA

"STATE OF CALIFORNIA
COUNTY OF LOS ANGELES } "AFFIDAVIT IN SUPPORT OF
AND PETITION FOR
A SEARCH WARRANT

"Personally appeared before me this 31st day of May, 1963, James Grennan, Los Angeles Police Department who, on oath, makes complaint, and deposes and says that he has and there is just, probable and reasonable cause to believe, and that he does believe, that there is now in the possession of Charline Peterson, aka, Charline Merritt on the premises located at and described as 240 West 113th Street, Los Angeles, California, a one story white frame single family residence with a garage in rear of residence, and in a vehicle described as 1962 Ford Fairlane yellow sedan, 1963 California license No. QLH 952 and on the person(s) of Charline Peterson, aka Charline Merritt the following personal property, to wit: heroin

"Facts in support of issuance of search warrant:

"Your affiant has been a police officer for 17 years and for the past 5 years has been assigned to the Narcotics Division of the Los Angeles Police Department with a primary duty of investigating narcotics activity. In his experience, he has made and assisted in making several hundred arrests for narcotics activity. Your affiant has received formal academic and informal on the job training from the Los Angeles Police Department in narcotics and has testified as an expert in the

Municipal and Superior Courts of Los Angeles County regarding narcotics charges, usage and traffic several hundred times. Your affiant is the investigator in charge of this case.

"On December 26, 1962 John D. Walker who had given prior information which resulted in the recovery of heroin told your affiant that Louise Brown was selling heroin from her residence at 2033 Harcourt Street, Los Angeles, California; that said Louise Brown purchased her heroin from a female known as Charline who would deliver the heroin by automobile to the above-mentioned location; that Charline was a nurse who imported heroin by ship from the Orient every three or four months.

"On January 8, 1963 your affiant arrested said Louise Brown at the above-mentioned address and recovered heroin there; that at the time of said arrest, David Rogers was in the house; that David Rogers told your affiant that Louise Brown was buying heroin in large quantities from a girl named Charline who was a nurse; that Charline would deliver the heroin to Louise Brown by automobile to the above-mentioned location; that Charline received her heroin from a ship arriving from the Orient every three or four months; that Charline's telephone number was PL 6-0983; on January 8, 1963 said David Rogers also gave reliable information that led to the arrest of one Frank Brown on January 9, 1963 for possession of narcotics at which time narcotics were recovered.

"On March 4, 1963 an untested informant told your affiant that Louise Brown was buying heroin in large quantities from a nurse known as Charline who lived in the south part of Los Angeles and who would deliver the heroin to Louise Brown at the above-mentioned location; that Charline received her heroin by ship from the Orient every three or four months.

"On May 31, 1963 another untested informant told your affiant that this informant was buying heroin in lots of one ounce and more from Charline Peterson who would deliver the heroin by automobile; that Charline can be reached by telephone number PL 6-0983; that Charline keeps her heroin in her residence located at 240 West 113th Street, Los Angeles, California; that Charline received her heroin by ship from the Orient every three or four months and just recently received such shipment.

"Investigation by your affiant revealed that the telephone number PL 6-0983 is registered to Charline Peterson at 240 West 113th Street, Los Angeles, California.

"Investigation by your affiant revealed that the utilities at

240 West 113th Street, Los Angeles, California are registered to Charline Merritt.

"Investigation by your affiant revealed that a 1962 Ford Fairlane yellow sedan, 1963 California license No. QLH 952 is registered to Charline Peterson at 240 West 113th Street, Los Angeles, California. On several occasions, the last of which was during the latter half of May, 1963, your affiant saw the above-described car in the driveway of 240 West 113th Street, Los Angeles, California.

"That based upon the aforementioned information, facts and circumstances, your affiant has reasonable cause to believe that grounds for the issuance of a search warrant, as set forth in Section 1524 of the Penal Code, exist.

"That based upon the above facts, your affiant prays that a search warrant be issued for the seizure of said property, or any part thereof, (at any time of the day or night, good cause being shown therefor), and that the same be brought before this magistrate or retained subject to the order of this court pursuant to Section 1536 of the Penal Code.

"JAMES GRENNAN
"Affiant
"JAMES GRENNAN

"Subscribed and sworn to before me this 31st day of May, 1963.

JAMES D. TANTE

Judge of the Municipal Court
Los Angeles Judicial District"

A petition for a rehearing was denied December 15, 1967, and appellant's petition for a hearing by the Supreme Court was denied January 24, 1968. Mosk, J., did not participate therein. Sullivan, J., was of the opinion that the petition should be granted.