[Crim. No. 670. Fifth Dist. Jan. 21, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK VELASQUEZ, Defendant and Appellant.

## Counsel

Frank Velasquez, in pro. per., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Nelson P. Kempsky and Willard F. Jones, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**COAKLEY J,**—Appellant was tried on a charge of possessing heroin for purposes of sale (Health & Saf. Code, § 11500.5). The jury returned a verdict of guilty. Appellant was denied probation and sentenced to the state penitentiary.

### Facts

Robert Mannen, employed as an agent of the state Bureau of Narcotic Enforcement, was in charge of the investigation which led to appellant's arrest and conviction. Mannen first received information that appellant was selling narcotics in the Fresno area in 1963. In August 1966, he received separate reports concerning appellant from two fellow agents of the bureau. The reports, received a few days apart, coincided in all material respects. The reports included (1) the residence address of appellant, (2) the color and make of his car, (3) that he was in possession of a large quantity of narcotics which were concealed at his home and around the premises, (4) that he was selling narcotics in the Fresno area, particularly at a named bar, and (5) that one of his customers was a John Trejo. From

official records Mannen verified appellant's ownership of the described car, and also that Trejo had a record of narcotic violations in the Fresno area extending over a period of years.

Early in September 1966, Mannen had a conversation with Detective McCully of the Fresno Police Department. McCully told Mannen that a man, later identified as Louie Mayorga, told him about, and later pointed out, where narcotics were buried. McCully dug at the spot indicated and found a jar containing balloons which he suspected contained narcotics. He showed one of the balloons to Mannen and told him that it and the other balloons were discovered about one hundred yards from appellant's residence in a field owned by appellant's landlord. McCully also told Mannen that two sets of footprints appeared to lead to the cache from a barn located at the rear of the premises occupied by appellant. Upon the basis of the foregoing information, Mannen set up a surveillance of the property occupied by appellant. The surveillance commenced on the evening of September 5. It concluded at about 10:45 a.m. on September 6, with the arrest of the appellant and the search of the premises which he occupied.

Mannen testified as follows concerning the events transpiring during the surveillance: At 7:40 a.m. on September 6, appellant drove into the driveway of his residence, parked the car and entered the house. Between then and 9:40 a.m., appellant made four trips between his house and the area of the barn. On his second trip to the barn he carried a shovel. Mannen observed appellant shoveling dirt from side to side, horizontally, rather than digging vertically. While the shoveling was in process, appellant was joined by Mayorga. Appellant and Mayorga eventually returned to the house. Together they made another trip from the house to the barn. Twice, while appellant was at the barn without Mayorga, the latter informed the officers that appellant was looking for narcotics he had buried.[1] Appellant made a fourth trip from the house to the barn. Upon returning to the house on his fourth trip appellant was observed to pause as he reached the rear steps, stoop down and make a motion as though he was feeling something under the steps. Appellant then got into his car and drove it "back and forth for a couple of feet" several times at the spot at which he had earlier parked it. After this activity, appellant stood about in his front yard until 10:15 a.m., when a car containing a man and a woman arrived at his residence. Mannen recognized the man as Juan Reyes, who was known to him as a user of narcotics. Appellant, Reyes and his companion Sandra talked in the yard for a few moments. Appellant then opened the

---

[1] The record is not clear as to the modus operandi of the communications. It appears, however, that Mayorga either telephoned or left the house and delivered the information to Agent Sherwood who relayed it by radio to Mannen.

trunk of his car and transferred several paper packages to the Reyes car. Believing that the packages contained narcotics, Mannen and his fellow officers left their place of surveillance and walked to the appellant's residence. Once there, Mannen looked through an aperture on the side of the rear steps where he had observed the appellant reach in a few moments before. On doing so, he saw a large blue balloon partially wrapped in tinfoil, inside of which were several smaller balloons. Mannen then walked to where appellant was standing and placed him under arrest. Mannen had neither a warrant of arrest nor a search warrant. A photo of the tinfoil package was taken through the aperture in the steps and was admitted in evidence. The package was then removed from beneath the steps, and later submitted for chemical analysis. It was found to contain heroin. The paper packages being transferred to Reyes' car did not contain contraband.

Shortly after arresting appellant, and while the appellant, Reyes, Sandra and the officers were still in the yard, Feliz Diaz arrived in another car. Mannen asked permission of Diaz to search him and his vehicle. Diaz consented. The search produced no contraband but did disclose numerous needle marks on the arm of Diaz and $200 in cash. Diaz was not held.

A search of the area of the barn produced two plastic bags containing one large balloon and several small balloons. They, too, were marked and delivered to a chemist for analysis, and were found to contain heroin. Altogether, the search of the premises produced heroin which had a wholesale value in excess of $3,000 and a retail value in excess of $6,000. Included within the seizure were 43 small balloons, each containing heroin. Recovered from beneath the steps were 30 small balloons containing heroin and three bags containing a total of 258 empty balloons.

Mannen testified that in the narcotic trade small balloons are used to package heroin which street peddlers often conceal in their mouths to permit quick swallowing if the peddler is apprehended. Mannen testified further that heroin packaged in small balloons is usually divided into about 20 separate bindles which retail at $5 each. Large balloons are used to hold large quantities of heroin and protect the drug from water, dampness and dirt. Thus, heroin is frequently buried in large quantities encased in balloons.

Appellant testified that he rented the premises; that he befriended Mayorga, a Mexican National, by letting him live there temporarily while Mayorga was attempting to obtain an extension of his visitor's permit; that Mayorga had occupied the house alone. on a number of occasions when appellant was away over night, and also for two or three days immediately preceding appellant's arrest when he had made a round trip to Brawley; and that he had known Reyes and Sandra for two years and Diaz for a

much longer time. He verified Mannen's testimony concerning his arrival home around 7 a.m., his four trips from house to barn, his shoveling of dirt in the area of the barn, and the stopping by the steps briefly. He testified that his purpose in going to the barn and shoveling in that area was to find some money that he had buried there. He denied ownership and knowledge of the heroin found on his premises.

Mayorga did not testify. An immigration officer, however, stated that Mayorga had surrendered his visitor's permit at the Mexican border on September 9 or 10, 1966. Presumably, Mayorga had returned to Mexico at that time and was not available to testify.

Following appellant's arrest, a female deputy sheriff of Fresno County had Sandra remove her clothes in the bathroom of appellant's home. In her brassiere was a kit containing a hypodermic needle, a spoon and an eye-dropper. Such kits are commonly used by addicts to inject heroin into the bloodstream. In Sandra's purse was an envelope containing $450.

An extended hearing was held out of the presence of the jury as to the admissibility of the jar containing heroin which Officer McCully had recovered from the field adjoining appellant's residence, and as to the heroin found on appellant's premises and seized by the officers on the morning of September 6. The court ruled that the evidence uncovered by McCully in the field was not admissible. The court overruled objections as to the admissibility of the narcotics found on the premises rented by the appellant and to the testimony concerning same.

ISSUES

I. ▮▮▮▮ *Did the officers have probable cause to arrest appellant without a warrant?* Yes.

"A peace officer may . . . without a warrant, arrest a person: . . . 3. Whenever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." (Pen. Code, § 836.)

In *Brinegar* v. *United States,* 338 U.S. 160, 175-176 [93 L.Ed. 1879, 1890, 69 S.Ct. 1302], we find the following as to what constitutes probable cause: " 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' [Citations.] And this 'means less than evidence which would justify condemnation' or conviction, as Marshall, C.J., said for the Court more than a century ago in *Locke* v. *United States,* 7 Cranch 339, 348, 3 L.Ed. 364. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which

they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Carroll* v. *United States,* 267 U.S. 132. . . ."

The California Supreme Court, in *People* v. *Talley,* 65 Cal.2d 830, 835 [56 Cal.Rptr. 492, 423 P.2d 564], declared: "A peace officer may arrest a person without a warrant '[w]henever he has reasonable cause to believe that the person to be arrested has committed a felony, . . .' (Pen. Code, § 836.) Reasonable or probable cause exists when the facts and circumstances within the knowledge of the officers at the moment of the arrest are sufficient to warrant a prudent man in believing that the defendant has committed an offense. [Citations.] The question of probable cause to justify an arrest without a warrant must be tested by the facts which the record shows were known to the officers at the time the arrest was made. [Citations.]"

In *People* v. *Fischer,* 49 Cal.2d 442, 446 [317 P.2d 967], the court held that: "Probable cause for an arrest is shown if a man of ordinary caution or prudence would be led to believe and consciously entertain a strong suspicion of the guilt of the accused."

From the facts of this case as summarized above, we find the following which have been held to constitute probable cause for arrest without a warrant:

■ (1) An arrest based on information received solely from a single reliable informant, even though it may involve evidence not admissible at the trial. (*People* v. *Roland,* 183 Cal.App.2d 780 [6 Cal.Rptr. 895].) ■ Though the trial court held that the narcotics which McCully found buried in the field were inadmissible, the information from Mayorga as to the exact spot where they were buried proved reliable. This, together with other information in Mannen's possession concerning appellant, was sufficient to set up the surveillance which led to the arrest.

■ (2) Information as to alleged activities received from an informer whose reliability has not been tested may constitute probable cause if supported or substantiated by information from other sources or by furtive or suspicious conduct. (*People* v. *Talley, supra,* 65 Cal.2d 830.) ■ There was both supportive information and suspicious conduct in this case. (See subparagraphs (3) and (4) below.)

■ (3) Police officers may rely on information coming to them from official sources (*People* v. *Schellin,* 227 Cal.App.2d 245, 251 [38 Cal.Rptr. 593]), including information from other police officers. ■ Here, Agent Mannen had received detailed reports of appellant's illegal activities from

fellow officers of the bureau on two occasions shortly before setting up the surveillance.

▮ (4) Observation of suspicious conduct may constitute probable cause for arrest. (*People* v. *Blodgett,* 46 Cal.2d 114, 117 [293 P.2d 57].) ▮ Appellant's conduct while under surveillance on the morning of September 6, coupled with the information which Agent Mannen had concerning the appellant, was more than sufficient to justify appellant's arrest without a warrant. (See *People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rtpr. 14, 348 P.2d 577].)

II. ▮ *No search warrant having been issued, was the search which followed appellant's arrest illegal?* No.

Relying on *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], appellant contends that the search violated his Fourth Amendment rights. *Chimel* was decided June 23, 1969. In *People* v. *Edwards,* 71 Cal. 2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713], the court held that *Chimel* applied only to cases in which the search took place after June 23, 1969. The search in this case occurred on September 6, 1966. Therefore, *Chimel* is not controlling on the issue of the validity of the search.

We do not wish to be interpreted as suggesting that if this were a post-*Chimel* case we would be compelled to declare it illegal under the doctrine of that case. True, the statement of the rule in *Chimel* appears to proscribe a warrantless search (following a lawful arrest) of the area beyond which the arrestee may obtain a weapon or destroy evidence. But, read in context and in relation to its facts, we do not believe that *Chimel* may reasonably be extended to declare unlawful a search made under the facts and circumstances of our case. The two cases are clearly distinguishable.

In *Chimel* the officers went to his home to arrest him under a warrant authorizing his arrest for the burglary of a coin shop. At Mrs. Chimel's invitation, they remained in a room of the home awaiting Chimel's return from work. He arrived shortly, whereupon the officers handed him the warrant and placed him under arrest. Over his objections, they then searched the entire three-bedroom home, including the attic, garage and workshop. "[T]he officers directed . . . [Chimel's] wife to open and 'to physically move contents of the drawers from side to side so that (they) might view any items that would have come from (the) burglary.' " The distinctions between the two cases are numerous and include, among others: (1) The very broad and extensive search of Chimel's entire home, whereas in our case the search was limited to the specific locations where the officers had observed appellant dig and reach for what they had every reason to believe was narcotics;

(2) unlike our case, neither Chimel nor his wife did anything in the presence or observation of the officers to indicate that they were committing a felony or attempting to hide or dispose of the evidence of a felony which either had committed; and (3) in *Chimel,* where the alleged burglary had been committed sometime prior to the day of the arrest, it would have been no more difficult for the officers to have obtained a search warrant than it was to obtain the warrant of arrest and to have served both warrants simultaneously. In our case, the felony was being committed in the presence of the officers. We know not whether time and circumstances permitted obtaining a search warrant prior to appellant's arrest. We do know that preparation of an affidavit[2] which will satisfy today's more rigid tests,[3] having it typed, locating a magistrate in a position to issue a search warrant, returning to the scene of the crime and serving the search warrant while, hopefully, the lawbreaker is still at the scene, is no small task, particularly between 7 and 11 a.m. As indicated, these are but some of the reasons why we believe *Chimel* is distinguishable.

We now examine the law, pre-*Chimel,* applicable to the search in this case. In *People* v. *Cruz,* 61 Cal.2d 861, 866 [40 Cal.Rptr. 841, 395 P.2d 889], decided in 1964, the court held that a search without a warrant, following an arrest without a warrant but on probable cause, is reasonable if it is limited to the premises where the arrest is made, is contemporaneous with the arrest, has a definite object, and is reasonable in scope. The permissible area of the search extends to those areas over which the person arrested has the right of access and use. (*People* v. *Smith,* 166 Cal.App.2d 302, 306 [333 P.2d 208].) As lessee of the house and yard, and by his frequent trips and digging at the barn, appellant's conduct demonstrated a right of access to and dominion over the locations searched clearly sufficient to justify a search of those locations by the officers.

The recent case of *People* v. *Bradley,* 1 Cal.3d 80 [81 Cal.Rptr. 457, 460 P.2d 129], is of interest on the question of a warrantless search of "constitutionally protected areas," more particularly, the legality of a search of grounds adjoining a house occupied by a defendant. In that case, on facts remarkably similar but not as strong as the facts of this case on the

[2]Usually by a peace officer, with or without the help of the district attorney, assuming the latter is available.

[3]See *People* v. *Hamilton,* 71 Cal.2d 176 [77 Cal.Rptr. 785, 454 P.2d 681], wherein a judgment following a guilty verdict was reversed upon grounds of insufficiency of the affidavit upon which the search warrant was issued; and *People* v. *Scoma,* 71 Cal.2d 332 [78 Cal.Rptr. 491, 455 P.2d 419], where an information was set aside for lack of probable cause (Pen. Code, § 995), the court holding insufficient the affidavit upon which the search warrant was issued.

validity of the search, the court held lawful a seizure of marijuana plants growing in a yard 20 feet from defendant's door where "presumably delivery men and others came." Noting that the evidence of defendant's possession was not overwhelming, the court, nevertheless, held that, under the facts and circumstances, an expectation of privacy on the part of defendant with respect to the area where the marijuana plants were growing would have been unreasonable, and, therefore, the area was not constitutionally protected. Accordingly, admission of the plants in evidence was held not to be error. The case was reversed, however, because the contraband seized inside defendant's home was admitted in evidence despite a clear violation of his Fourth Amendment rights proscribing unreasonable searches and seizures.

In our case the distance from the appellant's house to the barn, where appellant dug and where heroin was found and seized, was approximately 150 feet as compared with 20 feet in *Bradley*. In that case the marijuana plants were growing in a large yard, at least partially fenced, whereas, in our case, the heroin was found on the edge of an open cotton field adjoining the barn. In both cases it is not clear from the record whether the contraband was actually located on the premises rented and under the exclusive control of the respective defendants, or whether it was on immediately adjacent premises of their landlords.

III. ■ *Should the officers have discontinued their search when they found that that which was being transferred from the appellant's car to Reyes' car was not contraband?, No.*

Appellant contends that the transfer of the articles, alone, constituted what the officers believed was probable cause for his arrest; that when the articles involved in the transfer proved not to be narcotics there was no longer legal justification or authority for extending the search. This is true in part, only. The officers had observed suspicious conduct for three hours; they had information from a reliable informant as to appellant's purpose in digging at the barn; they had observed a highly suspicious movement at the steps; and on the way to making the arrest they had observed "tools of the trade," under the steps in the form of a large balloon. With the appellant were two known narcotic users. Clearly, the officers had ample reason to believe that a felony was being committed in their presence (Pen. Code, § 836, subd. 3), to wit, possession of narcotics, at the very least (Health & Saf. Code, § 11500). The fact that they were in error as to the contents of the packages being transferred from one car to the other would not have excused the officers from disregarding the considerable information concerning appellant's activities they had received, together with their personal observation of his highly suspicious conduct, and thereupon terminating their investigation of the premises under the appellant's dominion and control.

IV. ■ *Was the evidence of appellant's domination and control over the narcotics seized sufficient to sustain the verdict? Did appellant know it was heroin?*

The answer is "Yes" to both questions. Appellant's contention that the narcotics seized by the officers probably belonged to Mayorga defies reason. None is suggested why Mayorga, not himself a narcotic suspect, would lead officers to the discovery and seizure of more than $3,000 worth of heroin belonging to him.

Equally without merit is appellant's contention that the prosecution failed to meet its burden of proving appellant's knowledge of, and dominion and control over, the narcotics. ■ Proof of constructive possession is all that is required, and it may be established by circumstantial evidence. (*People* v. *Wilson,* 256 Cal.App.2d 411, 419 [64 Cal.Rptr. 172].)

■ With respect to whether the appellant knew the narcotic character of that which was hidden on or adjacent to the premises occupied by him, whether the evidence of appellant's dominion and control over the narcotics buried near the barn and hidden under the steps is considered to be circumstantial or direct, it is strong and conclusive. The inference of knowledge on the part of one having between $3,000 and $6,000 worth of narcotics in his possession, packaged as heroin is customarily packaged, is so strong that neither discussion nor citation of authority is indicated.

V. ■ *Was the evidence sufficient to support a verdict of possession for sale (Health & Saf. Code, § 11500.5) as distinguished from possession only (Health & Saf. Code, § 11500)?* Yes.

The affirmative answer to this question is established by the combination of these facts, among others:

(1) Appellant's possession of a quantity of heroin far in excess of what appellant might reasonably be expected to personally consume over a very long period, assuming he was addicted;

(2) His possession of a very large number of balloons customarily used for packaging heroin intended for sale to other peddlers and users, some of which balloons were filled, others empty;

(3) The arrival at appellant's residence of Reyes and Sandra, known to the officers to be users of narcotics, together with Sandra's concealment of the heroin kit in her brassiere; and

(4) The arrival of Diaz, whose arms revealed needle punctures typical of those found on the arms of heroin addicts.

In *People* v. *Robbins,* 225 Cal.App.2d 177 [37 Cal.Rptr. 244], in which

the defendant was convicted of possession of heroin for sale, as in this case, one of the issues was whether the prosecution had established the corpus delicti independent of the defendant's alleged admission. In affirming the judgment of conviction under facts much like those present in this case, the court said at page 184: "The record in the instant case reveals that defendant was observed to have repeatedly bent over in the immediate vicinity where a satchel containing narcotics was found secreted, thus supporting the inference of his possession of the narcotics. The great amount of heroin found, plus the fact that it was packaged in 11 separate containers, support the inference that it was possessed for sale rather than for personal use." (See *People* v. *Padilla,* 240 Cal.App.2d 114 [49 Cal.Rptr. 340].)

In our opinion, the inference of possession for sale is not merely strong, it is conclusive, and a jury failing to return a verdict of guilty as charged would be derelict in its duty.

The judgment is affirmed.

Stone, P.J., and Gargano, J., concurred.