[Civ. No. 21415. First Dist., Div. Three. Jan. 28, 1965.]

T. L. KINDER, Plaintiff and Respondent, v. WESTERN PIONEER INSURANCE COMPANY, Defendant and Appellant.

Berry, Davis, Lewis & McInerney and Samuel H. Berry for Defendant and Appellant.

Tinning & DeLap, Robert Eshleman and J. H. Filice for Plaintiff and Respondent.

DEVINE, J.—An insurance carrier appeals from a judgment in favor of its insured's assignee. The judgment is in amount $20,000, plus certain interest. This is the excess of the $30,000 judgment rendered against the insured in a personal injury action, over the $10,000 policy limit. The judgment is based on alleged bad faith in refusing to accept offers of settlement. As is common in this kind of case, the assignee of the insured was the plaintiff in the personal injury case.

## The Accident

On July 9, 1959, about 3:50 p.m., respondent Kinder and Scoggins, the insured, were involved in a four-car collision on the Eastshore Freeway. Kinder was driving in the extreme lefthand lane of a four-lane northbound area. Scoggins was driving behind him in the same lane. The vehicle ahead of Kinder stopped, and Kinder was able to stop. Scoggins collided with the rear of respondent's car. No skid marks were left by Scoggins' car. Kinder's car left 24 feet of skid marks forward from the point of impact, as found from debris, and 57 feet diagonally across the dividing line into the southbound

area. The impact apparently propelled Kinder's car over the dividing line and into the path of the oncoming traffic in the southbound area, where it collided with a third car, that of George Gasparich. The Gasparich car was pushed over into the lane to its right and collided with another car, driven by John Postana.

As a result of the collision, Mary Gasparich, the mother of George Gasparich, and a passenger in his car, was killed; George Gasparich, Postana and respondent sustained personal injuries. Respondent's injuries were serious, consisting of shattered right hip, destruction of hip socket, lacerations of right forearm with severance of fourth and fifth finger nerves, broken sternum, rib fractures, and whiplash injury to neck. He had a wage loss of $3,824.

A few more facts about the accident will appear in the discussion of the acts, conversations and deliberations of parties and witnesses.

*The Personal Injury Lawsuit and Settlement Negotiations*

1. *In General*

Respondent filed suit for personal injuries against Scoggins in Alameda County Superior Court. Gasparich sued Kinder and Scoggins, and Postana also sued Scoggins.

Scoggins' insurance coverage with appellant was $10,000 and $20,000. Appellant set up reserves for the four claims arising out of the above described injuries, as follows: for respondent, $7,500; for Postana, $4,000; for the death of Mary Gasparich, $3,500; for George Gasparich, $1,000. These reserves were never changed.

On October 25, 1960, 16 days before the trial, respondent offered to settle for $9,500 but stated that the offer would remain only until October 28, 1960. The letter contained a warning about the exercise of good faith by the insurer. The demand was repeated in a letter of November 4, 1960. Counsel for appellant replied that they were willing to negotiate. However, the highest authorization prior to trial was $4,500. Immediately prior to trial, appellant's counsel wrote to the company saying it was still his opinion that the company should pay up to $9,500, and that if judgment were awarded, it could very well exceed the policy limits. During the trial, Kinder's attorney offered to settle for $8,000. The company offered $7,500. After the verdict of $30,000 had been rendered, the company paid the limit of its policy, $10,000, to

Kinder. Thereafter, Scoggins assigned his claim, based on bad faith, to Kinder.

### 2. *Kinder.*

It was admitted by the claims manager for appellant that Kinder made a ''very, very good impression'' as a witness, far better than the impression made by Scoggins. There was no doubt whatever that Kinder had been rear-ended by Scoggins. He had lost consciousness and did not remember the head-on accident which followed the rear-end collision.

### 3. *Scoggins.*

It was recognized by appellant's claims manager that Scoggins was a man of below average intelligence, and by appellant's counsel that he was a man of low intelligence, that he would not make a good witness, and that he would be impeached by contradictory pretrial statements. Scoggins did not know whether he had struck Kinder's vehicle or not. He believed that he had been struck by a car coming in the other direction. This was contrary to all of the evidence in the case, and appellant makes no attempt to support this important statement by its insured. A highway patrol officer recommended that Scoggins be prosecuted on a misdemeanor charge, but the district attorney's office declined to prosecute.

Scoggins, a janitor, had no property with which to pay any part of the judgment which was rendered against him. When the action against him was commenced, he spoke to a lawyer who told him he did not need counsel because his insurance company had as good an attorney as he could get. Later, the insurance company's counsel sent Scoggins an ''excess letter'' telling him of his right to obtain his own attorney for his interest over the policy limits. Scoggins thought he did not receive any such letter and, anyway, did not remember getting it. He said that the carrier's counsel told him again about an attorney of his own, but at that time the trial was almost over. During the trial the company's attorney told Scoggins that there was an offer to settle for $8,500, that the company had offered $7,500, and that the company might offer a little more. Scoggins said nothing to the lawyer because he ''figured he knowed what he was doing.'' Scoggins testified that he would have said what he wanted to do ''if I had my say before.'' The trial judge admitted, and then struck, evidence that about three months after the accident the company cancelled or refused to renew Scoggins' policy.

### 4. *Attorney at the Personal Injury Trial.*

The attorney retained by the company (who is not counsel in the present litigation) had handled a large volume of defense work. He reported to the company that Kinder's injuries were substantial and that a verdict would probably run from $10,000 to $25,000. He recommended that, if necessary, the company should pay up to $9,500, with an initial offer in the area of $7,500. Although Scoggins had said that a vehicle, presumably Kinder's, had swerved in front of him, the attorney seems to have placed no reliance on this statement because he testified that he has no recollection of having presented it in the injury case. In fact, he had attempted to show that a car going in the opposite direction had changed lanes, and that this was the cause of confusion to Scoggins. The attorney wrote to the company that he had expected Scoggins to be substantially impeached, and that this actually had happened when Scoggins was called under section 2055 of the Code of Civil Procedure. A few days before the trial of the injury case, the attorney reported to the company that he had nothing to indicate that the plaintiff was guilty of contributory negligence. He testified that he had believed the company had "a chance."

### 5. *Appellant's Claims Manager.*

The man who had been claims manager for appellant came to a different conclusion from that which had been reached by the company's attorney. It was the manager's opinion that there was no liability and that the case was only of nuisance value. Later, however, after hearing the witnesses, he made an offer of $7,500. It was the manager's theory that Kinder's car had been turned to the left and was going at high speed, and that Scoggins' car had turned to the right in order to avoid collision. He drew this conclusion from the fact that there was damage to the right rear of Kinder's vehicle and the left front of Scoggins', and from Scoggins' saying to him that Kinder had swerved in front of him. It will be observed from the account given above of the attorney's conclusion that this theory was not given much, if any, weight by counsel.

### *Sufficiency of the Evidence to Support the Judgment*

The ultimate question is whether the insurer exercised good faith in protecting the interests of the insured. (*Comunale* v. *Traders & General Ins. Co.*, 50 Cal.2d 654, 661 [328 P.2d 198]; *Martin* v. *Hartford Accident & Indem. Co.*, 228 Cal.

App.2d 178, 182, 185 [39 Cal.Rptr. 342].) ▮ What is good faith is essentially a question of fact. (*Brown* v. *Guarantee Ins. Co.*, 155 Cal.App.2d 679, 689 [319 P.2d 69] ; *Davy* v. *Public National Ins. Co.*, 181 Cal.App.2d 387, 400 [5 Cal. Rptr. 488] ; *Martin* v. *Hartford Accident & Indem. Co., supra,* at p. 182.) ▮ In this type of case, reasonable inferences are of importance. (*Davy* v. *Public National Ins. Co., supra,* at p. 397; *Palmer* v. *Financial Indem. Co.*, 215 Cal.App.2d 419, 430 [30 Cal.Rptr. 204].) ▮ A supporting rule to that of good faith is that the insurer must give at least as much consideration to the interests of its insured as it gives to its own. (*Comunale* v. *Traders & General Ins. Co., supra,* at p. 659; *Ivy* v. *Pacific Automobile Ins. Co.*, 156 Cal.App.2d 652, 660 [320 P.2d 140] ; *Martin* v. *Hartford Accident & Indem. Co., supra,* at p. 182.) The attorney had predicted that the verdict might go as high as $25,000. There was an exposure of liability, therefore, of the insured to an excess of $15,000 (the fact proved it to be $20,000), in the attorney's estimation. As against this, the company could have settled the case during the trial, when things were admittedly going badly for the defense, for the difference between $7,500, which it had offered, and $8,000, which was then demanded by the plaintiff. The company itself did not have much to lose beyond the proposed settlement if it did not have to pay more than $10,000 in any event. ▮ If the company's policy had been in an unlimited amount, it is hard to believe that the company would have acted in the way that it did. This is another test of good faith. (*Davy* v. *Public National Ins. Co., supra,* at p. 400.) ▮ The fact that the insured had limited financial ability would not relieve the company from protecting his interests. (*Continental Cas. Co.* v. *Zurich Ins. Co.*, 57 Cal. 2d 27, 38 [17 Cal.Rptr. 12, 366 P.2d 455].)

▮ The company had the duty of consulting qualified persons on the matter of settlement. (*Palmer* v. *Financial Indem. Co., supra,* at pp. 428-429.) ▮ The person particularly charged with protecting the interests of both the company and the insured is the lawyer. This case shows a struggle between the lawyer and the claims manager, the former recommending settlement up to $9,500, which would have been ample to settle the case, and the manager taking the position that the case had only nuisance value, until it was demonstrated otherwise during the trial, and then offering $500 short of the necessary amount.

▮ It is the duty of the insurer to keep the insured informed of settlement offers. (*Martin* v. *Hartford Accident &*

*Indem. Co., supra,* at pp. 183-184; *Davy* v. *Public National Ins. Co., supra,* at p. 396.) In this case, it was particularly important for the insurer to explain the matter thoroughly to the insured because of his limited ability to comprehend. The lawyer was asked whether he had advised Scoggins of the settlement negotiations before the trial and he replied, ''Yes, I think I did,'' and that Scoggins was told that there were additional claims; but, beyond that, we have no evidence of discussions or advice before trial on the matter of the settlement offer. During the trial, the attorney informed Scoggins of the $7,500 offer, and said that more might be put up as the trial progressed, but after that, from all that appears, did not take the matter up again with Scoggins. All in all, there is plenty of evidence by which the jury could have concluded that the primary interest of the company was in saving as much as it could, and that Scoggins' interest was considered, at most, to be secondary.

 It is urged by appellant that this case must be distinguished from all of the others in which judgment for an excess over the policy limits has been sustained in that none of the other cases involves, as this one does, multiple claims. It is argued that the claims manager had to protect Scoggins against the other claimants as well as against Kinder. Appellant attempts to avoid the significant fact of the attorney's recommendation of settlement by saying that he did not take into consideration the position that settlement might leave Scoggins in with respect to the remaining claims, and that the claims manager was the person charged with evaluating all of the pertinent facts. We cannot agree with this. The lawyer, although selected by the company, was the lawyer for the insured as well. He was also engaged by the company to defend the other claims arising from the accident, and, presumably, had knowledge of the entire factual situation. Scoggins was the client and had a right to have information, protection, guidance and advice from the lawyer. His interests should not have been determined by the judgment of the claims manager, which, unknown to him, was at variance with that of the lawyer.

Appellant cites cases to the effect that an insurance company may be held in bad faith for the over-eager settlement of some claims, to the detriment of others. (*Brown* v. *United States Fidelity & Guaranty Co.,* 314 F.2d 675 [judgment for defendant on demurrer reversed; company had paid to some claimants in violation of express agreement with others, and

alleged to have made inadequate investigation]; *Duprey* v. *Security Mutual Casualty Co.*, 43 Misc.2d 811 [252 N.Y.S.2d 375] [immediately prior to selecting jury for trial of all claims, carrier settled one, leaving insufficient amount to pay others].) If it may be granted that a carrier, faced with multiple claims, must, with due regard for the interests of its insured, attend to his best protection against all of these, this consideration would by no means justify reversal of the judgment. There is no evidence that the company made any effort to compose the claims of all, either with or without judicial assistance. The company actually did offer $7,500 for the Kinder claim and could have disposed of it for another $500. It can hardly be thought that the company's concern for other claims could be alleviated justifiably at $7,500, but became compelling at $8,000.

Besides, the jury in the present action was given no information about any attempt to dispose of the other claims or of any demand (other than in the prayers of the complaints) made by other claimants. We do know, as the jury did, that the reserve set up for the Kinder claim was $7,500, and for all the others combined, $8,500.

Appellant argues that the claims of the others must have been superior to that of Kinder because no contributory negligence could be set up against the others. But, as stated above, no evidence about activities in respect of negotiation of the other claims was given, and the reserves just stated were never changed. The defense of contributory negligence as to Kinder had been discounted by the company's attorney, and he had written to the company saying so.

## Instructions

 The trial court refused an instruction offered by appellant, containing the following language: "In such circumstances [multiple claims] a public liability carrier is entitled to consider whether the joint interests of its assured and itself would be served by the payment of a disproportionate portion of its insurance fund to any one claimant so as to leave the assured exposed to other claims which its depleted funds can not satisfy." The difficulty with this instruction is that appellant failed to present proof of the status of the other claims, and that the jury did not have evidence to show that payment of the amount which was acceptable to Kinder was a disproportionate portion of the fund, or that it would leave the assured exposed to claims which depleted funds could not satisfy.

Appellant's complaint of two other instructions may be treated rather summarily. One is that there was reference to a limit of $10,000 of the policy rather than $10,000 and $20,000, in one of the court's instructions. The limits of the policy were amply made known to the jury, however, by testimony. In another instruction, a few argumentative words such as "mere" were removed by the court from an excerpt in the *Davy* case, *supra*. This was quite proper for the court to do.

### Admissibility of Evidence

Appellant complains that the court improperly allowed evidence that the policy was terminated shortly after the accident; that this gave the jury the impression that the company was being oppressive toward its insured; and that the effect could not have been erased by the court's striking of this evidence. We believe that the evidence was admissible for whatver effect it might have had to show that the company believed that Scoggins was liable, to contradict the claims manager's statement that the case had but nuisance value, and to show that the company no longer had an interest in Scoggins as a customer. Even if the termination were ⌐ the ground, stated by appellant's counsel, that the company realized that Scoggins wasn't a prepossessing witness, this would tend to show more reason for settling the case. But if the admission of the evidence were in error, the prompt instruction to the jury to disregard it would have cured the mistake. (*Barlin* v. *Barlin,* 156 Cal.App.2d 143, 145 [319 P.2d 87].)

Judgment affirmed.

Draper, P. J., and Salsman, J., concurred.

A petition for a rehearing was denied February 18, 1965, and appellant's petition for a hearing by the Supreme Court was denied March 24, 1965.