[Civ. No. 39703. Second Dist., Div. Two. Oct. 29, 1973.]

DEWEY MERRITT, Plaintiff and Appellant, v.
RESERVE INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Lascher & Rader and Edward L. Lascher for Defendant and Appellant.

Magana & Cathcart, William M. Thon, Ellis J. Horvitz and Arthur E. Schwimmer for Plaintiff and Appellant.

## OPINION

**FLEMING, J.**—In 1961 a truck driven by Merritt and owned by Sterling Transit collided with a truck driven by Bernal and owned by J. A. Stafford Co., a California corporation. Merritt sued Bernal and Stafford Co. for personal injuries, and Sterling Transit sued them for property damages. In 1964 judgment was obtained by Merritt for $434,000 and by Sterling Transit for $21,000, and this judgment was affirmed on appeal in 1965.

Reserve Insurance Company, the liability insurance carrier for Stafford Co., paid $100,000 to Merritt, the full amount of its personal injury coverage, and paid $21,000 to Sterling Transit. There remained unsatisfied

$334,000 of Merritt's judgment against Stafford Co. and Bernal. Stafford Co., in exchange for a covenant not to execute against it on the unsatisfied judgment, paid Merritt $20,000 and assigned to him its claims for damages as an assured against Reserve Insurance and the latter's agents. As Stafford Co.'s assignee Merritt then filed the present suit in 1966 on Stafford Co.'s claims for damages against its carrier, Reserve, for the latter's bad faith and negligent defense of Stafford Co. against Merritt's action for personal injuries. In 1966 the superior court ordered judgment on the pleadings in favor of Reserve on the count for negligent defense, but denied judgment on the bad faith count. The cause went to trial in 1971 on the bad faith count, and the jury returned a verdict of $499,000 against Reserve in favor of Stafford Co.'s assignee. Reserve has appealed the judgment and the order denying its motion for judgment notwithstanding the verdict; and Staffords Co.'s assignee, Merritt, has appealed the judgment in favor of Reserve on the count for negligent defense.[1]

*The Pleading of Bad Faith.*

The pertinent allegations of the count charging Reserve with bad faith defense of the case of Merritt v. Stafford Co. are:

## "XIII

"In connection with the case of Merritt vs. Stafford . . . defendants [Reserve] . . . undertook the defense of said action on behalf of J. A. Stafford Trucking Co. and Salvador Bernal and took complete charge and control of the litigation in said action. Said defendants employed counsel to defend said action . . . and the counsel thus selected and appointed . . . acted for and on behalf of and as the agent and representative for defendants and each of them.

## "XIV

"Defendants, and each of them, did not act in the best interests of J. A. Stafford Co. and Salvador Bernal and did not exercise the good faith required of them by the law in handling of the defense of J. A. Stafford Co. and Salvador Bernal in the case of Merritt vs. Stafford . . . in that said defendants failed to properly investigate and prepare for said litigation;

---

[1]The order granting judgment on the pleadings is not appealable. (*Adohr Milk Farms, Inc.* v. *Love,* 255 Cal.App.2d 366, 369 [63 Cal.Rptr. 123].) We construe Merritt's appeal to be from that part of the judgment adverse to him, i.e., the judgment for Reserve on the count for negligent defense.

failed to properly undertake, initiate, entertain or pursue discussions with plaintiff [Merritt] for the disposition and settlement of said case at any stage of the proceeding prior to judgment; repeatedly and erroneously misled J. A. Stafford Trucking Co. into a false sense of security and resulting inaction by assuring it that its interests and the interests of its employee, Salvador Bernal, were being adequately protected; and failed to properly protect the interests of J. A. Stafford Trucking and Salvador Bernal in the trial, appeal and satisfaction of said action."

*History of First Suit.*

On 3 August 1960 Reserve Insurance issued an automobile liability insurance policy to Stafford Co., which provided personal injury coverage of $100,000 for each person and $300,000 for each accident, and property damage coverage of $25,000. The policy bound Reserve to pay to the limits of its coverage any sums the insured should become legally obligated to pay as damages and to defend any suit seeking damages against the insured. The policy authorized Reserve to investigate, negotiate, and settle any claim or suit against the insured as it deemed expedient.

On the evening of 20 February 1961 a southbound truck owned by Sterling Transit and driven by Merritt collided on Highway 99 near Merced with the rear of Stafford Co.'s southbound truck driven by Bernal, and as a result of the collision Merritt suffered severe and permanent personal injuries. Shortly after the accident, both Reserve, the insurance carrier for Stafford Co., and Transport Indemnity, the insurance carrier for Sterling Transit, undertook separate investigations of the accident.

Reserve obtained a statement from Robert Cox, who said he was driving southbound on Highway 99 in the slow lane about 125 feet behind Stafford Co.'s truck; that Merritt's truck had been following him at 60 miles per hour, had passed him on the left, had then "whipped" back into the slow lane and collided with the rear of Stafford Co.'s truck; that Merritt's truck had flipped over, and Cox had pulled the injured Merritt from the cab of his truck. Reserve also secured a statement from Stafford Co.'s driver, Bernal, who said he was traveling at 45 miles an hour when he was struck in the rear by Merritt's truck; that he had recently checked his tail lights, and they were functioning at the time of the accident. Reserve's investigators examined Stafford Co.'s vehicle, checked with the highway patrol officer who handled the accident, obtained a copy of the California Highway Patrol accident report, and attempted without success to talk to the injured Merritt. Reserve's Fresno adjuster reported: "It is obvious,

from the statements of Bernal, the witness, Cox, and the investigation of the highway patrol, this is a case of non-liability on the part of your insured's driver."

Transport Indemnity's investigation on behalf of Sterling Transit, the owner of Merritt's truck, covered much the same ground. But its investigation also included a number of photographs of the Stafford Co. vehicle as well as an inspection by an electrical engineer of the condition of the lights on the Stafford Co. vehicle.

In June 1961, four months after the accident, Merritt filed suit against Stafford Co. and Bernal for $400,000 damages for personal injuries, and Sterling Transit sued for $24,000 property damages to its vehicle. Stafford Co. forwarded the complaint to Reserve, and the latter then advised Stafford Co. by registered mail that "[t]he amount of damages requested in this suit is $400,000 which is in excess of the limits of coverage provided under your policy with Reserve Insurance Company. This is to advise you, therefore, that you may at your option retain legal counsel to represent your interests in the excess amount." The letter also informed Stafford Co. that Reserve had employed the law firm of Hecker, Dunford & Kenealy to represent Stafford Co. in the defense of the suit. Reserve forwarded its file on the accident to the defending law firm, and that firm concluded from its study of the file that although serious personal injuries were involved, the case was one of non-liability. Thereafter, throughout the course of its employment the firm of Hecker, Dunford & Kenealy consistently and repeatedly advised the carrier that the case was one of non-liability. A chronological representation of this advice follows:

| | |
|---|---|
| 14 July 1961 | Letter, Hecker, Dunford & Kenealy to Reserve: The case is "an absolute case of nonliability." This advice was consistent with that previously given Reserve by its Fresno adjuster and with information contained in the California Highway Patrol accident report, which attributed responsibility for the accident to an improper lane change by Merritt. |
| 19 November 1962 | Letter, Hecker, Dunford & Kenealy to Reserve: This is "a case of virtually no liability, and one that certainly should be successfully defended." |
| 28 January 1963 | Letter, Hecker, Dunford & Kenealy to Reserve: "[T]his [is] a case of nonliability." |

| 1 April 1963 | Letter, Hecker, Dunford & Kenealy to Reserve: "This is a nonliability case in which the plaintiff collided with the rear of our truck. . . . We continue to believe that this is a case of absolute nonliability." |
|---|---|
| 27 May 1963 | Letter, Hecker, Dunford & Kenealy to Reserve: This is "a case of absolutely no liability." |
| 5 June 1963 | Letter, Hecker, Dunford & Kenealy to Reserve: "We know of nothing on which he [plaintiff] can base a case." |
| 23 October 1963 | Letter, Hecker, Dunford & Kenealy to Reserve: "This is a case of questionable liability." Plaintiff's chance of winning "is too remote to even place a settlement evaluation." |
| 30 January 1964 | Letter, Hecker, Dunford & Kenealy to Reserve: "[T]his case will be successfully defended." |

Dunford, the firm's attorney who ultimately tried the case, knew that Reserve's personal injury liability under its policy was limited to $100,000 for each person and $300,000 for each accident. However, from time to time, Dunford was assured by J. A. Stafford, the president of Stafford Co., that the latter had taken out an excess policy of liability insurance in an unknown amount. Dunford at various times described the limit of Stafford Co.'s personal injury liability insurance as $100,000, $300,000, $500,000, or unknown. Up to the time of the second trial in 1971 J. A. Stafford continued to insist in the existence of an excess policy, but he never identified or produced such a policy for Reserve.

Prior to the trial Dunford told Stafford there was nothing to worry about; there was no need to settle; it was not necessary for Stafford to be personally present at the trial. The firm of Hecker, Dunford & Kenealy also consistently advised Reserve and its agents that no possibility for settlement existed:

| 28 January 1963 | Letter to Reserve: "We do not see any possibility of even considering or discussing settlement." |
|---|---|
| 27 May 1963 | Letter to Reserve: The compensation carrier reasonably expects to expend approximately $300,000 in care. "Obviously settlement is completely out of question in this case." |

23 October 1963      Letter to Reserve: Plaintiff's chance "of winning is too remote to even place a settlement evaluation. It is obvious that they will not accept a token settlement."

No settlement offer was ever made by Merritt, or Sterling Transit, or Transport Indemnity, Sterling Transit's workmen's compensation insurance carrier, and the sole demand on behalf of Merritt up to the time of trial was the $400,000 set out in the complaint. On the day the trial started, Merritt sought and received permission to increase his prayer for damages from $400,000 to $650,000. Dunford did not inform Stafford Co. of the increase.

The result of the trial turned out quite differently from what had been anticipated by defense counsel. Merritt testified he was going 45 to 50 miles an hour when he saw a sudden flash of lights in front of him and crashed into Stafford Co.'s slowly moving vehicle before he could stop. The electrical engineer who had inspected Stafford Co.'s vehicle two days after the accident on behalf of Transport Indemnity, the insurance carrier for Sterling Transit, testified that the lighting system on Stafford Co.'s vehicle contained defects that could have caused its rear lights to fail. Plaintiffs discredited the testimony of Bernal, Stafford Co.'s driver, by pointing out improbabilities in his estimate of travel times and by bringing out the fact that Bernal had two felony convictions for smuggling. Plaintiffs discredited Cox's testimony through the use of traffic-accident experts, who concluded that Cox's version of the times and distances involved in the accident was physically impossible. Plaintiffs also pointed out that despite Cox's claim to close involvement in the accident, the California Highway Patrol accident report did not list his name as a witness.

The jury returned a verdict of $434,000 for Merritt and $21,000 for Sterling Transit against Stafford Co. and Bernal. The court denied defense motions for a new trial and for judgment notwithstanding the verdict; and this judgment was subsequently affirmed on appeal.

*History of Second Suit.*

As Stafford Co.'s assignee, Merritt filed the present suit in 1966 against Reserve Insurance, grounded upon Stafford Co.'s right of action against Reserve for bad faith and negligent defense of the earlier suit that had resulted in an unsatisfied judgment of $334,000 against Stafford Co. In October 1966 Reserve's motion for judgment on the pleadings was granted

on the negligence count by a minute order that gave plaintiff 25 days to file objections. No objections were filed, and in November 1966 the court ordered the negligence count dismissed.

The cause eventually came to trial on the bad faith count in March 1971. At the trial the circumstances and events connected with the accident and with the conduct of the first suit were reviewed in detail. Merritt's attorneys testified as expert witnesses in support of Stafford Co.'s cause of action against Reserve that a settlement is often worked out in a case where, as here, the amount of workmen's compensation lien (estimated at $221,000 at the time of the first trial and $300,000 at the time of the second trial) exceeds the amount of liability insurance coverage. The judge who presided at the trial of the first suit appeared as an expert witness on behalf of plaintiff in the second suit and gave testimony that the credibility of the witness Cox had been low. Other testimony suggested that the defense's investigation of the accident and defense counsel's preparation for trial and presentation of its defense in court had been inadequate in view of the potential liability to which Stafford Co. had been exposed.

The jury returned a verdict of $499,000 in favor of Merritt as assignee of Stafford Co.; the court denied a motion for judgment notwithstanding the verdict; and this appeal followed.

*Rights Involved in This Cause of Action.*

The cause of action on which the judgment is based arises solely out of the rights of Stafford Co. against its insurance carrier, Reserve, and the cause must be evaluated exclusively in terms of Stafford Co.'s rights as an assured, for the subsequent assignment of those rights to Merritt added nothing to their scope. (*Brown* v. *Guarantee Ins. Co.,* 155 Cal.App.2d 679, 695-696 [319 P.2d 69].) Throughout the opinion it must be kept in mind that we are dealing with Stafford Co.'s rights and not those of Merritt.

*Obligations of the Carrier to Its Assured.*

Our starting point in evaluating Stafford Co.'s rights as assured against its carrier, Reserve, is found in the contract of the parties, the automobile liability policy in which for a specified premium Reserve promised coverage to Stafford Co. of its liability for personal injury up to $100,000 for each person and $300,000 for each accident, and coverage for property damages up to $25,000. Under the policy Reserve promised to the limits of its coverage: "To pay on behalf of the insured all sums which the insured

shall become legally obligated to pay as damages because of bodily injury . . . caused by accident . . .

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property . . . caused by accident . . .

"[To] defend any suit against the insured . . . seeking damages on account thereof . . . but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; . . ." Under the policy the carrier assumed two different obligations: (1) to pay to the limits of its coverage sums which the insured should become legally obligated to pay as damages for bodily and property injury; (2) to defend any suit against the insured seeking such damages. In connection with these obligations the carrier reserved the right to investigate, negotiate, and settle any claim or suit as it deemed expedient.

Performance of the carrier's first specific obligation, to pay to the limits of its coverage sums the insured should become legally obligated to pay, is not an issue on this appeal and need not be discussed. Performance of the carrier's second specific obligation, to defend the insured against any suit seeking damages, is conceded, for the carrier did arrange to defend the insured against suit, and only the manner of that performance has been questioned. The carrier, of course, like any other contractor, was obligated to perform the duties it assumed under the contract in a workmanlike manner, a point we discuss later in this opinion.

But in addition to these two specific obligations the carrier assumed a third continuing obligation under its liability insurance contract, a duty to deal fairly and in good faith with its assured, the other party to the contract. This duty of good faith and fair dealing between parties to a liability insurance contract is reciprocal, and it amounts to something more than the usual duty of good faith between contracting parties, this for the reason that in limited liability insurance contracts conflicts of interest between assured and carrier remain endemic to their relationship, and whenever a conflict of interest breaks out the carrier becomes obligated to protect the interests of the assured equally with its own.

Some general discussion of the relationship between the parties to a typical liability insurance contract may help clarify the duty of good faith and fair dealing that arises when the interests of the parties come into conflict. Liability insurance policies are universally written with coverages that obligate the carrier to satisfy the assured's legal liability only within

specified amounts. It is a consequence of such contracts that the carrier underwrites the risk of the assured's liability for damages to a specified amount, and the assured carries his own risk of liability above that amount. Normally, it is the assured's sole responsibility to determine what part of the risk the carrier will underwrite and what part it will assume for itself. If the assured wishes to pass on the entire conceivable risk of liability for damages to one or more carriers, it will pay a higher premium. If it contracts for the carrier to underwrite only part of the conceivable risk, it will pay a lower premium. Under the typical arrangement the carrier underwrites the risk of the assured's liability to specified amounts selected by the assured, and the assured assumes the risk of its liability above those amounts.

The varying relationship between assured and carrier under a policy of limited liability insurance may be illustrated by reference to the minimum policy coverage required under California law. Vehicle Code section 16059 specifies the minimum allowable coverage for an automobile insurance policy as $15,000 for one personal injury, $30,000 for one accident, and $5,000 for property damage. An assured who contracts for this minimum policy is covered for liability in damages to those amounts, but has assumed his own risk of liability above those amounts. Suppose a claimant files suit seeking $50,000 damages for personal injuries against an assured who holds a minimum policy. At that point both assured and carrier have a common interest in resisting the suit, for if claimant obtains judgment in the amount he seeks the carrier will become liable for $15,000 and the assured liable for $35,000. The defense against the suit presents no problem of good faith, for the interests of carrier and assured are parallel.

But suppose the claimant offers to settle his suit for $10,000. On the tender of this offer a divergence of interest promptly arises between assured and carrier. From the assured's point of view any settlement up to the full amount of his coverage ($15,000) is in his interest, for the settlement eliminates the possibility of any liability attaching to him with respect to the share of the risk he has assumed. No matter how remote the possibility may be of a judgment in excess of $15,000, settlement will always be to the interest of the assured—for the settlement will cost him nothing. On the other hand, from the carrier's point of view settlement of the suit for $10,000 may or may not be to its interest. Mathematically, only if the odds are two to one in favor of claimant's securing a judgment of $15,000 or more, will it be in the carrier's interest to settle.[2] Thus, when a settle-

---

[2]Approximate odds may be calculated by simple arithmetic. If a carrier defending three lawsuits under $15,000 policy limits settles each of them for $10,000, it will pay out $30,000. If, instead, it goes to trial on these three lawsuits, wins one and

ment within policy limits is offered by claimant, the previously parallel interests of assured and carrier diverge, and a conflict of interest arises, for while it is invariably to the assured's financial interest to settle within policy limits, settlement is only to the carrier's financial interest when the relationship between settlement offer and policy limits is mathematically favorable in the light of the probabilities of winning or losing the suit.

Resolution of the conflict of interest between assured and carrier created by a claimant's offer to settle within policy limits is complicated by the fact that under the insurance contract the carrier retains control over the defense of the lawsuit. Customarily, the carrier has selected and employed counsel who defend the suit on behalf of the assured and has reserved to itself the right to investigate, negotiate, and settle the suit against the assured. The assured is not in a position to exercise effective control over the lawsuit or to further his own interests by independent action, even when those interests appear in serious jeopardy. The assured may face the possibility of substantial loss which can be forestalled only by action of the carrier. Thus the assured may find himself and his goods in the position of a passenger on a voyage to an unknown destination on a vessel under the exclusive management of the crew.

The carrier, as well, may find itself in a somewhat comparable position. Although it remains in control of the litigation, it, too, faces the possibility of substantial loss, and it, too, may find itself unable to control the course of the litigation in accordance with its true interests. For example, acceptance of a settlement offer may be actuarially unsound but the carrier may be compelled to such a decision because its assured is underinsured or because its assured faces a remote possibility of very great liability.

When an offer is made to settle a claim in excess of policy limits for an amount within policy limits, a genuine and immediate conflict of interest arises between carrier and assured. The normal legal remedy for conflicts in interest is separate representation for the conflicting interests. This remedy, however, possesses only a limited usefulness in the present situation, for while the assured can be advised, as he usually is, that he may employ separate counsel to look after his interests, separate representation usually amounts to nothing more than independent legal advice to the assured, since control of the litigation remains in the hands of the carrier. Control

---

loses the other two in amounts at or above policy limits, it will pay out $30,000, the same amount it paid to settle. If we disregard costs of trial, we conclude that, mathematically, the odds in favor of full policy limit recovery by a claimant must be two to one, or better, in order to make this particular settlement actuarially attractive to the carrier.

of the defense of the lawsuit cannot be split, and independent legal advice to the assured cannot force the carrier to accept a settlement offer it does not wish to accept. In this instance the normal legal remedy of separate representation is an inadequate solution to the conflict in interest.

Nor can the liability of the assured be divided into separate segments, about which the carrier and the assured may make their separate evaluations and go their separate ways. Patently, the carrier cannot settle its share of the assured's liability and turn the assured adrift, exposed to a suit for excess liability financed by the carrier's settlement. Nor can the assured settle the claim for excess liability and abandon the carrier to defend a suit financed by the assured's settlement. For better or worse, like a married couple, assured and carrier must make the best of each other.

Since the remedy of separate representation is inadequate, and since the remedy of a separate peace, or settlement, amounts to a betrayal of the obligations the parties have assumed under the contract, the courts have been forced to improvise in order to find a workable solution to the problem of conflict of interest.[3] The current status of these efforts confirms the carrier in its control over the litigation, but requires the carrier to consider in good faith the interests of the assured equally with its own and evaluate settlement offers within policy limits as though it alone carried the entire risk of loss.

The California rule governing the carrier's conduct when conflicts of interest arise from a claimant's offer to settle a claim within policy limits has been formulated in terms of good and bad faith. In *Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883], the Supreme Court said: "It is generally held that since the insurer has reserved control over the litigation and settlement it is liable for the entire amount of a judgment against the insured, including any portion in excess of the policy limits, if in the exercise of such control it is guilty of bad faith in refusing a settlement. (*Brown* v. *Guarantee Ins. Co.,* 155 Cal.App.2d 679, 682 [319 P.2d 69]; *Ivy* v. *Pacific Automobile Ins. Co.,* 156 Cal.App.2d 652, 659 [320 P.2d 140] . . . .)" (P. 660.) The court distinguished good faith from bad faith in the following terms: "The insurer, in deciding whether a claim should be compromised, must take into account the interest of the insured and give it at least as much con-

---

[3]For discussions of the generally unsatisfactory nature of all proposed solutions, see Keeton, *Liability Insurance and Responsibility for settlement,* 67 Harv.L.Rev. 1136; Peterson, *Excess Liability, etc.,* 18 Stan.L.Rev. 475; *An Insurance Company's Duty to Settle: Qualified or Absolute?,* 41 So.Cal.L.Rev. 120.

sideration as it does to its own interest. (See *Ivy* v. *Pacific Automobile Ins. Co.*, 156 Cal.App.2d 652, 659 [320 P.2d 140].) When there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim. Its unwarranted refusal to do so constitutes a breach of the implied covenant of good faith and fair dealing." (P. 659.)

Under this rule a carrier in control of litigation which has rejected a settlement in bad faith may become liable to its assured for the resulting loss. In *Crisci* v. *Security Ins. Co.*, 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173], the Supreme Court upheld the imposition of liability on a carrier for bad faith rejection of an offer to settle within policy limits. The test for determining whether the carrier has given good faith consideration to the interests of the assured, said the court, is whether a prudent carrier on a policy of unlimited liability would have accepted the settlement offer. A carrier which unwarrantedly rejects a reasonable settlement offer may become liable to its assured for resulting losses.

California's appellate courts have considered the problem on several occasions. In *Brown* v. *Guarantee Ins. Co.*, 155 Cal.App.2d 679 [319 P.2d 69], this court recognized that liability may be imposed on a carrier for rejection of a claimant's offer to settle within policy limits when the carrier has rejected the offer in bad faith. The court did not specifically define bad faith, but postulated bad faith as the opposite of good faith. The court then set out its view of what comprised good faith rejection by the carrier of a settlement offer within policy limits: "[T]he obligation of the insurer should not be extended beyond the duty of exercising good faith in the conduct of the matters arising from that relationship . . . . If the insurer has exercised good faith in all of its dealings under its policy, and if the settlement which it has rejected has been fully and fairly considered and has been based upon an honest belief that the insurer could defeat the action or keep any possible judgment within the limits of the policy, and its judgments are based on a fair review of the evidence after reasonable diligence in ascertaining the facts, and upon sound legal advice, a court should not subject the insurer to further liability if it ultimately turns out that its judgment is a mistaken judgment. Such a responsibility could hardly be claimed to be in contemplation of the insurance relationship." (P. 684.)

The carrier's decision must be honest, intelligent, and knowledgeable. The court recognized the carrier's right to control litigation on which it has assumed primary liability and to protect its own interests in order that

it may survive and continue in business. The court then observed: "The insurer, obviously, has a right to give heed to its own interests when it considers settlement offers, but when it does so it must give at least as much attention to those of the insured." (P. 686.)

Other cases have tended to repeat in slightly different language the same general propositions on the carrier's liability for bad faith rejection of a settlement offer within policy limits. For example, in *Ivy* v. *Pacific Automobile Ins. Co.,* 156 Cal.App.2d 652, 659 [320 P.2d 140], the court said that in evaluating settlement offers within policy limits the carrier must act in good faith to protect the assured and must take into account and give fair and objective consideration to the assured's interests; in *Davy* v. *Public National Ins. Co.,* 181 Cal.App.2d 387, 395 [5 Cal.Rptr. 488], the court observed that in considering settlement offers within policy limits the carrier has the right to protect its own interests but not the right to sacrifice the interests of the insured; in order to fulfill its obligation to act in good faith, said the court, the carrier must take into account and give as much consideration to the assured's interests as it gives to its own. See also, *Hodges* v. *Standard Accident Ins. Co.,* 198 Cal.App.2d 564 [18 Cal. Rptr. 17]; *Palmer* v. *Financial Indem. Co.,* 215 Cal.App.2d 419 [30 Cal.Rptr. 204]; *Kelley* v. *British Coml. Ins. Co.,* 221 Cal.App.2d 554 [34 Cal.Rptr. 564]; *Martin* v. *Hartford Acc. & Indem. Co.,* 228 Cal.App.2d 178 [39 Cal.Rptr. 342]; *Critz* v. *Farmers Ins. Group,* 230 Cal.App.2d 788 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142]; *Kinder* v. *Western Pioneer Ins. Co.,* 231 Cal.App.2d 894 [42 Cal.Rptr. 394]; *Lysick* v. *Walcom,* 258 Cal.App.2d 136 [65 Cal.Rptr. 406, 28 A.L.R.3d 368]. The cases unanimously agree that in considering a carrier's liability for rejection of an offer to settle within policy limits the test is bad faith and not negligence.

We can summarize the gist of these cases as follows: When a claimant offers to settle an excess claim within policy limits a conflict of interest immediately arises between carrier and assured. In such circumstances the carrier is required to evaluate the settlement offer in good faith, and good faith requires it to consider the interests of the assured equally with its own or, as some of the cases have said, to evaluate the settlement offer as though the carrier itself were liable for the full amount of the claim. If the carrier rejects the offer to settle within policy limits without having made an honest, intelligent, and knowledgeable evaluation of the offer on its merits, then the carrier has acted in bad faith and may become liable to its assured for consequential damages caused by its bad faith rejection.

The duty of good faith thus imposed upon the carrier is one peculiar to this situation. In most legal relationships determination of the merits of conflicting interests by one of the parties to the conflict is forbidden. No man can be judge in his own case; no trustee may weigh his personal interest against that of his beneficiary; no agent may evaluate his personal profit against that of his principal; and no public officer may balance private gain against public interest. Yet the carrier who receives an offer to settle an excess claim within policy limits is instructed to weigh its own interest on the scales along with those of its assured in order to make a good faith determination whether to accept or reject the offer. Patently, such an instruction is a counsel of perfection impossible of complete realization. On the one hand, the carrier is advised it is not required to jettison its own interests by accepting every offer of settlement within policy limits in order to achieve risk-free status for its assured. On the other hand, the carrier is advised it may not ignore the risk of loss under which its assured labors, especially in those instances where a small amount of settlement will liquidate a large amount of risk. Necessarily, the carrier must make the best of these instructions, must conscientiously try to strike a balance between conflicting interests, and must attempt to evaluate the merits of an offer to settle within policy limits both from its own point of view and from that of the assured.

In making its evaluation only a few benchmarks serve to guide the carrier. The courts agree that the carrier must make a rational and knowledgeable assessment of the advisability of accepting or rejecting the settlement offer. The courts also agree that the carrier is not required to predict at its peril the outcome of the suit or the credibility of the witnesses. But beyond these propositions the tracks peter out. In instructing the carrier to consider its own interests equally with those of the assured, the courts have forced the carrier a considerable distance into the field of abstract speculative calculation and required it on occasion to assume hypotheses contrary to fact. For example, the carrier, in evaluating its own interests equally with those of its assured, is compelled to assume that the assured can respond in damages up to the entire amount sought by claimant in his prayer. Therefore, in evaluating a settlement offer tendered to an assured without assets the carrier is theoretically required to assume that its assured can respond in damages to the full amount of the claim. (*Kinder* v. *Western Pioneer Ins. Co.,* 231 Cal.App.2d 894, 898, 900 [42 Cal.Rptr. 394].) Conceptually, the carrier is required to ignore the fact that the assured contracted for limited coverage, thereby evaluating his own liability at a limited amount and implying minimal risk of loss beyond that amount. In practice, however, the financial responsibility of the assured is a critical

element in the claimant's willingness to settle and in the disposition of the lawsuit. In the real world, the assured with large means and the assured without means have entirely different interests at risk.

What the courts appear to require when they say that the carrier which receives an offer to settle an excess claim within policy limits must evaluate its own interests equally with those of its assured, is that the carrier give careful and serious consideration to the interests and position of the assured in determining whether to accept or reject the settlement offer. The carrier cannot exclusively preoccupy itself with its own interests but must also weigh the real interests of the assured. An assured without assets has little at stake, an assured with some assets something at stake, and an assured with large assets a great deal at stake. In each instance the carrier is required to give serious and careful consideration to the true position and interests of its assured. Obviously, these interests will vary from person to person.[4]

At this point we recall that the problem is one of conflict of interest, that normally the interests of carrier and assured are parallel, and that only with the tender of a settlement offer within policy limits do the interests of the assured and the carrier diverge. If a settlement offer is made in excess of policy limits, what obligations or duties then fall upon the parties to the policy? Suppose in our hypothetical case of the $15,000 minimum policy and the $50,000 claim, claimant makes an offer to settle for $30,000. If the offer is accepted, the carrier's loss will be $15,000 and the assured's loss will be $15,000. Obviously, the first step is for the carrier on the tender of such an offer to communicate the offer to the assured. If the assured does not have the resources to contribute $15,000 to the settlement, nothing the carrier can do will effect this particular settlement, and no conflict of interest arises between carrier and assured. But suppose the claimant then offers to settle his claim for $17,000 and suppose further the assured is willing and able to pay $2,000 as his contribution to the settlement of the claim. The issue thus posed is whether in settlement of the claim for $50,000 the carrier will pay the full amount of its policy, $15,000, to enable the assured to settle a potential liability of $35,000 for $2,000. In this situation the conflict of interest is real, and its solution cannot be reduced to mechanical formula.

---

[4]Consider in the present suit the position of Bernal, the driver of the Stafford Co. truck. An unsatisfied judgment of $334,000 remains outstanding against him. As an insured and third-party beneficiary under the policy he is owed the same general obligations that are owed to Stafford Co., the assured. Yet his interests have been ignored by all parties to the present litigation, an attitude that undoubtedly mirrors his status as a judgment debtor without assets whose damages as a result of the judgment were minimal.

In resolving such dilemmas the courts have done little more than list a number of factors that may be considered in evaluating the propriety of the carrier's decision. Most of these have been itemized in the court's opinion in *Brown* v. *Guarantee Ins. Co.*, 155 Cal.App.2d 679, 689 [319 P.2d 69]: "In deciding whether the insurer's refusal to settle constitutes a breach of its duty to exercise good faith, the following factors should be considered: the strength of the injured claimant's case on the issues of liability and damages; attempts by the insurer to induce the insured to contribute to a settlement; failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; the insurer's rejection of advice of its own attorney or agent; failure of the insurer to inform the insured of a compromise offer; the amount of financial risk to which each party is exposed in the event of a refusal to settle; the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and any other factors tending to establish or negate bad faith on the part of the insurer." (P. 689.)[5]

In applying these factors it was said in *Davy* v. *Public National Ins. Co.*, 181 Cal.App.2d 387, 396 [5 Cal.Rptr. 488]: "Good faith implies honesty, fair dealing and full revelation. (*Hilker* v. *Western Automobile Ins. Co.*, 204 Wis. 1 [231 N.W. 257, 235 N.W. 413, 415].) Bad faith implies dishonesty, fraud and concealment. (*Appel* v. *Morford*, 62 Cal.App.2d 36, 40 [144 P.2d 95].) Neither mistaken judgment nor unreasonable judgment is the equivalent of bad faith. (*Neel* v. *Barnard*, 24 Cal.2d 406, 418 [150 P.2d 177].) As a consequence, liability upon the part of the insurer for refusal to accept an offer of settlement may not be predicated upon its failure to correctly predict the outcome of the action it is defending."

---

[5]We note that the jury instructions on proximate cause in the case relied on this language from our prior opinion. When used as jury instructions on proximate cause, we think this language tends to be somewhat misleading. (*Brown* v. *Guarantee Ins. Co.*, 155 Cal.App.2d 679, 689 [319 P.2d 69]; *Davy* v. *Public National Ins. Co.*, 181 Cal.App.2d 387, 402 [5 Cal.Rptr. 488].) "The admonition has been frequently stated that it is dangerous to frame an instruction upon isolated extracts from the opinions of the court." (*Francis* v. *City & County of San Francisco*, 44 Cal.2d 335, 341 [282 P.2d 496].) "Judicial opinions are not written as jury instructions and are notoriously unreliable as such." (1 Stanbury, Cal. Trial and Appellate Practice, § 630, p. 695.) "One of the reasons for care in adopting a court opinion verbatim as a jury instruction is that its abstract or argumentative nature may have a confusing effect upon the jury." (*Sloan* v. *Stearns*, 137 Cal.App.2d 289, 300 [290 P.2d 382]; see also, *People* v. *Wilson*, 256 Cal.App.2d 411, 421 [64 Cal.Rptr. 172]; *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists*, 227 Cal.App.2d 675, 718 [39 Cal.Rptr. 64]; *Royko* v. *Griffith Co.*, 147 Cal.App.2d 770, 772 [306 P.2d 36]; and *Reagh* v. *S. F. Unified School District*, 119 Cal.App.2d 65, 73 [259 P.2d 43].)

■ While much remains obscure in this field of the law it is apparent from this summary that (1) the legal rules relating to bad faith come into effect only when a conflict of interest develops between the carrier and its insured; (2) a conflict of interest only develops when an offer to settle an excess claim is made within policy limits or when a settlement offer is made in excess of policy limits and the assured is willing and able to pay the excess.

*Cause of Action for Bad Faith.*

■ With this background in conflict of interest we turn to the facts of the case at bench. Merritt filed suit against Stafford Co. for $400,000 damages for personal injuries, and on the day of trial he increased his prayer for damages from $400,000 to $650,000. At no time did he make any offer to settle, nor did he or his counsel or his compensation insurance carrier ever advance any suggestion that settlement could be profitably discussed. The evidence shows that the workmen's compensation carrier's lien against any recovery by Merritt for personal injuries was estimated at $300,000, that at the time of the first trial $76,000 had actually been paid out under workmen's compensation and a reserve of $145,000 had been established for future payouts. The limit of Stafford Co.'s coverage for a single personal injury under its policy with Reserve was $100,000. Stafford Co.'s net worth at all times was less than $100,000, and at the time of the first trial it approximated $40,000. Although J. A. Stafford insisted up to and after the time of trial that Stafford Co. had an excess policy of liability insurance, at no time did he produce an excess policy or inform anyone what carrier had underwritten such a policy. Apparently all persons connected with this litigation have assumed throughout that the driver, Bernal, an added insured under Reserve's policy, is judgment proof, and therefore his status is not a factor of consequence in the litigation.

In our view these facts conclusively demonstrate that the interests of carrier and assured at all times were parallel and not divergent, that nothing occurred to create any conflict of interest between them or to suggest the existence of any factors, which, if acted upon, might have created some conflict of interest. Since no offer to settle was ever made, either within policy limits (the normal prerequisite for conflict of interest) or above policy limits but within feasibility limits of the assured's resources, we conclude that no conflict of interest ever developed between assured and carrier, and therefore the issue of the carrier's bad faith in relation to its assured never arose.

Stafford Co.'s assignee cites several extraneous factors as justification for the absence of any settlement offer and as a basis for holding Reserve

liable for bad faith apart from any formal conflict of interest. The first of these is confusion over the amount of personal injury liability insurance that Stafford Co. carried. It is argued that if Merritt and Transport Indemnity had been informed of the absence of other liability insurance they might have presented a settlement offer that would have been beneficial to Stafford Co.'s interest. The short answer to this contention is that the entire confusion on this subject originated with Stafford Co. itself, which can scarcely base a cause of action against Reserve for the latter's misinformation about the amount of Stafford Co.'s liability insurance when the source of Reserve's misinformation came from Stafford Co. itself. J. A. Stafford kept insisting, even at the time of the second trial, that Stafford Co. had a policy of excess insurance with some other carrier, but he never produced the policy nor did he ever specify the carrier that had underwritten such a policy. Patently, the fact that Stafford Co. believed an excess policy existed and communicated its belief to counsel acting for itself and for Reserve, who in turn communicated this belief to Merritt and Transport Indemnity, in nowise creates a cause of action in Stafford Co. against Reserve for the latter's failure to discover the true amount of Stafford Co.'s liability insurance and communicate it to Merritt. Patently, Reserve had no way of accurately obtaining this information except from Stafford Co. itself.

The second factor cited in support of Stafford Co.'s claim against Reserve for bad faith refusal to settle is Reserve's failure to initiate settlement overtures to Merritt and his compensation insurance carrier. It is theorized that if Reserve had made such overtures the case could have been settled to Stafford Co.'s satisfaction. This theory is supported by no evidence whatsoever. Up to the time of trial Merritt's and Sterling Transit's prayer remained at $400,000 for damages for personal injuries and $24,000 for property damages. No invitation was ever tendered by them to Stafford Co. or to defense counsel or to Reserve to make a settlement offer. On the day of trial Merritt increased his prayer from $400,000 to $650,000. Reserve was periodically and consistently advised by defense counsel that settlement was impossible in view of the size of the workmen's compensation lien ($300,000). No request to initiate settlement discussion was ever made by Stafford Co. to Reserve. In this connection we note that Stafford Co. brought its own suit for property damage against Sterling Transit, the owner of the truck Merritt had been driving, an action that suggested that Stafford Co. agreed with defense counsel's evaluation of the case as one in which fault rested on the opposing party.

The third factor cited by Stafford Co.'s assignee to support Reserve's liability to Stafford Co. for bad faith refusal to settle is Reserve's failure

to notify Stafford Co. at the start of the trial that the claimant had increased his prayer for damages from $400,000 to $650,000. We think this lapse was an error chargeable to counsel on the scene in Los Angeles rather than one chargeable to Reserve in Chicago. Clearly, however, this failure to keep Stafford Co. posted on new developments in the lawsuit has no causal connection with Stafford Co.'s asserted claim against Reserve for bad faith refusal to settle. To the contrary, it was a development in the opposite direction from settlement.

We conclude that none of these extraneous factors has any bearing on Stafford Co.'s asserted cause of action against Reserve for bad faith refusal to settle. No settlement offer was ever made, either within policy limits, or within policy limits supplemented by the assured's net worth. No demand for settlement was ever presented by the assured to the carrier. (Cf. *Garner* v. *American Mut. Liability Ins. Co.*, 31 Cal.App.3d 843 [107 Cal.Rptr. 604].) No suggestion that settlement was feasible was ever made prior to judgment by anyone connected with the suit. The case, therefore, does not involve a conflict of interest and does not present a situation in which the carrier can be found to have acted in bad faith toward its assured. On the contrary, the interests of carrier and assured remained parallel at all times, and no divergence of interests ever developed. Consequently, no cause of action arose on behalf of Stafford Co. against Reserve for bad faith refusal to settle, and the trial court should have entered judgment for defendant Reserve notwithstanding the verdict on the cause of action for bad faith.

*The Pleading of Negligence.*

The cause of action of Stafford Co.'s assignee for negligence was dismissed in advance of trial by an order granting judgment on the pleadings. In pertinent part, this count charged Reserve with negligent defense of the Merritt v. Stafford lawsuit as follows:

"II

"Defendants [Reserve] . . . handled the defense of J. A. Stafford Co. and Salvador Bernal in the case of Merritt vs. Stafford . . . in a negligent manner and without exercising due care and without due regard for the best interests of J. A. Stafford Co. and Salvador Bernal in that said defendants failed to properly investigate and prepare for said litigation; failed to properly undertake, initiate, entertain or pursue discussions with plaintiff [Merritt] for the disposition and settlement of said case at any stage of the proceeding prior to judgment; repeatedly and erroneously misled J. A.

Stafford Trucking Co. into a false sense of security and resulting inaction by assuring it that its interests and the interests of its employee Salvador Bernal were being adequately protected; and failed to properly protect the interests of J. A. Stafford Trucking and Salvador Bernal in the trial, appeal and satisfaction of said action."

Basically, this count charged Reserve with negligent handling of the defense in the case of Merritt v. Stafford in two respects: (a) negligent failure to initiate settlement discussions; (b) negligent conduct of the litigation (investigation, preparation, trial, appeal, and satisfaction). In entering judgment on the pleadings in favor of Reserve on this count, the trial court in effect determined that the count, as pleaded, failed to set forth a cause of action against Reserve.

With respect to the first charge, negligent failure to initiate settlement discussions, we have seen from our review of the California cases that actionable failure to settle must encompass bad faith, that negligence alone is insufficient to support the charge. As the court said in rejecting the negligence test in *Brown* v. *Guarantee Ins. Co.,* 155 Cal.App.2d 679, 688 [319 P.2d 69], "[t]o justify such a result [liability in excess of policy limits] requires substantial culpability on the part of the insurer—bad faith rather than mere negligence . . . negligence alone is insufficient to render the insurer liable."

The second charge in this count is negligent handling and conduct of the defense in the case of Merritt v. Stafford. The charge, however, was directed against Reserve and not against the independent trial counsel who conducted and handled the defense of the lawsuit. Plaintiff's theory on this aspect of the case is that trial counsel acted as agents for their employer, Reserve, and the employer may be held liable for the negligent conduct of its agents in defending the lawsuit.

We do not accept the claim that vicarious liability falls on one who retains independent trial counsel to conduct litigation on behalf of a third party when retained counsel have conducted the litigation negligently. (*Estate of Barbikas,* 171 Cal.App.2d 452, 459 [341 P.2d 32].) In our view independent counsel retained to conduct litigation in the courts act in the capacity of independent contractors, responsible for the results of their conduct and not subject to the control and direction of their employer over the details and manner of their performance. By its very nature the duty assumed by Reserve to defend its assured against suits must necessarily be classified as a delegable duty, understood by all parties as such, for Reserve had no authority to perform that duty itself and, in fact, was

prohibited from appearing in the California courts. (Bus. & Prof. Code, § 6126.) Since a carrier is not authorized to practice law (*People* ex rel. *Los Angeles Bar Assn.* v. *California Protective Corp.*, 76 Cal.App. 354 [244 P. 1089]; Bus. & Prof. Code, §§ 6125 and 6127.5), it must rely on independent counsel for the conduct of the litigation. We reject the suggestion that the carrier assumed by contract a nondelegable duty to present an adequate defense. (Cf. *Smoot* v. *State Farm Mutual Automobile Insurance Co.* (5th Cir. 1962) 299 F.2d 525; *Attleboro* v. *Frankfurt Marine, etc., Ins. Co.* (1st Cir. 1917) 240 F. 573.) Absent compelling reasons of public policy (*Van Arsdale* v. *Hollinger,* 68 Cal.2d 245 [66 Cal.Rptr. 20, 437 P.2d 508]; *Maloney* v. *Rath,* 69 Cal.2d 442 [71 Cal.Rptr. 897, 445 P.2d 513, 40 A.L.R.3d 1]) an employer is not liable for the negligence of an independent contractor. (*Williams* v. *Fairhaven Cemetery Assn.,* 52 Cal.2d 135 [338 P.2d 392]; 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, § 310, p. 1506 (1969 Supp.) p. 698; Rest. 2d Torts, § 409.) An attorney may act as an employee for his employer in carrying out nonlegal functions (*Casselman* v. *Hartford A. and I. Co.,* 36 Cal.App.2d 700 [98 P.2d 539]); he may be the agent of his employer for business transactions (*Tomerlin* v. *Canadian Indemnity Co.,* 61 Cal.2d 638, 643 [39 Cal.Rptr. 731, 394 P.2d 571]), or for imputed knowledge (*Kelley* v. *British Coml. Ins. Co.,* 221 Cal.App.2d 554, 560-561 [34 Cal.Rptr. 564]); but in his role as trial counsel, he is an independent contractor. (*Otten* v. *San Francisco Hotel etc. Assn.,* 74 Cal.App.2d 341, 343 [168 P.2d 739]; *Associated Indem. Corp.* v. *Ind. Acc. Com.,* 56 Cal.App.2d 804, 807-808, 810 [133 P.2d 698]; 1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 24, p. 33; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 20, p. 655; Rest. 2d Agency, § 1, com. e; *Estate of Barbikas,* 171 Cal.App.2d 452, 459 [341 P.2d 32].)

We confine our consideration to the circumstances of this case, where the carrier employed independent trial counsel to conduct the defense of the lawsuit for the insured. (Cf. Rest. 2d Agency, § 223, com. a; § 250, com. a.) Thus in *Otten* v. *San Francisco Hotel etc. Assn., supra,* 74 Cal.App.2d 341, 343: "The evidence shows that plaintiff's assignor during the whole period that he was acting as defendants' attorney maintained his separate office in San Francisco where he engaged in the general practice of the law. He was not a servant of the defendants but an independent contractor retained to perform professional services." Having chosen competent independent counsel to represent the insured in litigation, the carrier may rely upon trial counsel to conduct the litigation, and the carrier does not become liable for trial counsel's legal malpractice. If trial counsel negligently conducts the litigation, the remedy for this negli-

gence is found in an action against counsel for malpractice and not in a suit against counsel's employer to impose vicarious liability.

Reserve, of course, remains liable for the negligent performance of its own duties. Under the policy Reserve assumed three principal duties in relation to the assured: (1) to make immediate inquiry into the facts of any serious accident as soon as practicable after its occurrence; (2) on the filing of suit against its assured to employ competent counsel to represent the assured and to provide counsel with adequate funds to conduct the defense of the suit; (3) to keep abreast of the progress and status of the litigation in order that it may act intelligently and in good faith on settlement offers. The conduct of the actual litigation, including the amount and extent of discovery, the interrogation, evaluation, and selection of witnesses, the employment of experts, and the presentation of the defense in court, remains the responsibility of trial counsel, and this is true both on plaintiff's side and on defendant's side of the case.

In our view the trial court correctly concluded that the negligence count, in its then form, did not set forth any breach of duty by Reserve of the obligations with which it was chargeable. Plaintiff was given ample time by the court to amend its pleading of the negligence count. Plaintiff neither objected to the court's ruling nor moved to amend its pleading, and in November 1966 the court ordered the negligence count dismissed. Trial of the action did not take place until 1971. From this chronology it is apparent that plaintiff chose to rely wholly on the bad faith count and not to pursue the negligence count against Reserve. (*Hardy* v. *Admiral Oil Co.,* 56 Cal.2d 836, 841-842 [16 Cal.Rptr. 894, 366 P.2d 310]; *Ser-Bye Corp.* v. *C. P. & G. Markets,* 78 Cal.App.2d 915, 917-918 [179 P.2d 342].)

*Other Matters—Appearance of Impropriety.*

For future guidance of bench and bar we discuss one other feature of the case.

■ At the second trial there appeared as an expert witness on plaintiff's behalf the judge who had presided over the trial of the first suit, which had resulted in a judgment on behalf of plaintiffs for $434,000 and $21,000, respectively. The judge testified that in his expert opinion, Cox, a witness produced by the defense at the earlier trial, had not been a persuasive witness, an opinion that tended to support an inference that the defense had not been skillfully handled.

A judge should avoid not only impropriety but the appearance of impropriety. Canon 4 of the Canons of Judicial Ethics adopted by the Con-

ference of California Judges states: "A judge's official conduct should be free from impropriety and the appearance of impropriety . . ." More often than not a losing litigant tends to feel, if only temporarily, that the trial judge favored the other side at his expense, a feeling especially prevalent when a case had been lost that the litigant thought should have been won. Such feelings were present here. Subsequent to the judgment against Stafford Co. defense counsel wrote Reserve's agent: "[The trial judge] seemed throughout the trial to be sympathetic to the plaintiff. Frankly, his general attitude disgusted us . . ." When thereafter the trial judge appeared as an expert witness on behalf of plaintiff in the second suit, Reserve's reactions are not difficult to imagine. The pre-existing suspicion of judicial favoritism undoubtedly ripened into firm conviction on the judge's appearance as an opposition witness.

We think it prejudicial to one party for a judge to testify as an expert witness on behalf of the other party with respect to matters that took place before him in his judicial capacity. In such instance the judge appears to be throwing the weight of his position and authority behind one of two opposing litigants. The Evidence Code absolutely prohibits the judge presiding at the trial of an action to testify as a witness over the objection of a party. (Evid. Code, § 703; *People* v. *Connors,* 77 Cal.App. 438, 453 [246 P. 1072].) We think it only slightly less prejudicial when a judge expresses his opinion as a witness about events that occurred in an earlier trial over which he had presided. Almost on all fours is *Aetna Casualty & Surety Company* v. *Price* (1966) 206 Va. 749 [146 S.E.2d 220], an action by an insured doctor against his medical malpractice carrier for refusal to settle a claim against the doctor for an amount within policy limits. Judgment for the doctor was reversed on appeal, the Supreme Court of Appeals of Virginia finding the evidence patently insufficient to show bad faith on the part of the carrier. The court stated in part: "We will also exclude from our consideration all testimony relating to the statements of Judge McGuire and Judge Hart, of the District Court, concerning their recommendations of amounts for which the Neyland claim should have been settled. That testimony was inadmissible. Its prejudicial effect was compounded when Judge Hart, himself, departed his bench in Washington, appeared as a witness in the trial of the present action and was permitted to repeat, to the jury, what had been his and Judge McGuire's recommendations." (146 S.E.2d at p. 227.)

We conclude that the trial court erred in permitting the judge to testify as an opinion witness with respect to matters that had come before him in his judicial capacity.

The judgment in favor of plaintiff is reversed, the order denying judgment notwithstanding the verdict is reversed, and the trial court is directed to enter judgment in favor of defendant on the bad faith cause of action. The judgment in defendant's favor on the cause of action for negligence is affirmed.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied November 28, 1973, and the petition of the plaintiff and appellant for a hearing by the Supreme Court was denied January 24, 1974. Tobriner, J., Mosk, J., and Sullivan, J., were of the opinion that the petition should be granted.